[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. McAlpin*, Slip Opinion No. 2022-Ohio-1567.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-1567

THE STATE OF OHIO, APPELLEE, *v*. MCALPIN, APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. McAlpin*, Slip Opinion No. 2022-Ohio-1567.]

*Criminal law—Aggravated murder—Death penalty—Aggravating circumstances outweigh mitigating factors—Convictions and death sentence affirmed.*

(No. 2019-0926—Submitted June 15, 2021—Decided May 12, 2022.)

APPEAL from the Court of Common Pleas of Cuyahoga County,

No. CR-17-623243.

_____

STEWART, J.

{¶ 1} Appellant, Joseph McAlpin, was charged with kidnapping, robbing, and murdering Michael Kuznik and Trina Tomola at their used-car business in Cleveland in 2017. At his trial by jury, McAlpin waived his right to counsel and represented himself. McAlpin was found guilty of all charged offenses, including two counts of aggravated murder with four death-penalty specifications attached to each count. Following the jury's recommendation, the trial court sentenced McAlpin to death.

{¶ 2} We now review McAlpin's direct appeal of right. For the following reasons, we affirm his convictions and sentence of death.

## I. TRIAL EVIDENCE

### A. The robbery of Mr. Cars

{¶ 3} Andrew Keener testified at McAlpin's trial that on April 14, 2017, McAlpin and McAlpin's brother Jerome Diggs met him on the east side of Cleveland. McAlpin and Diggs spoke for about 30 minutes in McAlpin's car, and then Diggs asked Keener whether he wanted to make some money. Diggs said that he and McAlpin planned to "hit this spot for titles and car keys" and then sell the cars. He promised Keener money and drugs if Keener would drive a stolen vehicle off the lot. Keener agreed and got into McAlpin's car. Keener thought that this was around 4:00 or 5:00 p.m.

{¶ 4} Keener testified that McAlpin drove to a side street near Mr. Cars and parked. McAlpin appeared to be wearing multiple layers of clothing, including red jogging pants, a black hooded sweatshirt, and brown boots. When McAlpin got out of the car, his sweatshirt was lifted up a little bit and Keener saw the butt of a gun near his hip. McAlpin pulled his sweatshirt back down, hiding the gun.

{¶ 5} Keener testified that after McAlpin left on foot and had been gone for about 20 minutes, Diggs used Keener's cell phone to call McAlpin and asked what was taking so long. About five minutes later, Diggs called McAlpin again. McAlpin eventually called Keener and told him that "the car's on and ready." Keener entered the Mr. Cars lot and saw McAlpin, who was wearing different clothes than the ones he had been wearing earlier in the evening. McAlpin was also wearing a baseball cap, pulled down low to hide his eyes.

{¶ 6} Keener got into a 2006 Mercedes 430 and moved it. Keener drove the car off the lot and down a side street, where Diggs was waiting. Keener then moved to the passenger seat, and Diggs drove the car. They followed McAlpin, who was driving a 2008 BMW 528i, to a parking lot on the west side of Cleveland. Keener

and Diggs left the Mercedes in that lot and got into the BMW with McAlpin. Keener noticed that McAlpin was holding a stack of banking and credit cards.

{¶ 7} McAlpin drove the BMW to another spot on the west side and parked. A woman picked up McAlpin and Diggs and left. Keener contacted his girlfriend, who picked him up.

{¶ 8} According to Keener, several days passed before he found out that people had been murdered during the robbery. He had called McAlpin's phone multiple times because he had not been paid. Eventually he spoke to Diggs, who told Keener that they had not yet sold the cars. Keener was never paid.

{¶ 9} In exchange for testifying against McAlpin, the state offered Keener a plea deal. Keener pleaded guilty to involuntary manslaughter with two firearm specifications that would merge for the purposes of sentencing and one count of grand theft. He was sentenced to an aggregate six-year prison term.

### B. The discovery of Michael's and Trina's bodies

{¶ 10} In April 2017, Michael and Trina lived around the corner from Mr. Cars. Three children lived in the home with them at the time of the murders—19-year-old son Colin Zaczkowski, a 13-year-old daughter, and a 6-year-old son.

{¶ 11} Around 9:00 or 9:30 p.m. on April 14, 2017, Trina and Michael's daughter told Zaczkowski that she was concerned that their parents were not home yet. Zaczkowski drove to Mr. Cars and noticed multiple things that were not as they should be. For instance, Michael and Trina's car was still parked in front of the building. Zaczkowski also noticed that the "blockers," cars that they typically parked in front of the car lot's gate to deter theft, were not in place. Also, the lights inside the dealership were off, but the showroom door was propped open.

{¶ 12} Zaczkowski entered the building and found who he thought was his mother—in fact, it was Michael—dead in a pool of blood. He immediately left the building and called 9-1-1.

**{¶ 13}** Cleveland police detectives Alexander Gumucio and Kevin Warnock responded. Detective Warnock interviewed Zaczkowski, and Detective Gumucio, who was wearing a body camera, did a walkthrough of the building. The state played excerpts from Gumucio's body-camera video for the jury.

**{¶ 14}** The first excerpt showed a dead man lying face down behind a desk, just beyond the front entrance. Next in the video, Detective Gumucio walked around the showroom and into a back hallway, where he saw a dead dog. The back hallway led to an office where Gumucio saw a dead woman. The bodies were identified as Michael and Trina and their dog, Axel.

## C. The police investigation

**{¶ 15}** Zaczkowski told Detective Arthur Echols that at least three cars were missing from Mr. Cars: a BMW, a Mercedes, and a Chevrolet Tahoe. Echols later learned that the Tahoe had been sold on April 13.

**{¶ 16}** Zaczkowski testified that Michael always carried cash on him. Testimony established that two customers had purchased cars from Mr. Cars on April 14, 2017. They made cash payments totaling at least $7,500. Michael's wallet was stolen and there was no other cash found at Mr. Cars.

**{¶ 17}** The security system at Mr. Cars was stolen, and key components of the system, including the digital video recorder, were gone. However, investigators were able to get security footage of the Mr. Cars lot from a business across the street. Investigator Tom Ciula testified that the camera was too far away to identify faces but that magnification made it possible to see what was going on during the relevant period. Detective Echols also recovered surveillance footage from a wireless-phone store located one block north of Mr. Cars. Based on the other businesses' surveillance footage, investigators confirmed that at least two individuals were involved in the crimes.

**{¶ 18}** Detective Echols received an anonymous tip in April indicating that Diggs and "Joshua McAlpin, or McAlpine" were involved in the crimes at Mr.

Cars. On April 20, patrol officers recovered the stolen BMW at 3310 West 48th Street. The stolen Mercedes was recovered from a banquet-center parking lot in a southwestern Cleveland suburb.

{¶ 19} On June 8, 2017, the Cuyahoga County Regional Forensic Science Laboratory notified Detective Echols that DNA matching McAlpin's DNA profile was found on a modem collected from the back office of Mr. Cars and on swabs collected from inside the back pocket of Michael Kuznik's jeans and inside the stolen BMW.

{¶ 20} McAlpin was arrested on June 13, 2017. Detective Echols read McAlpin his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). McAlpin waived his right to counsel and denied all involvement in the crimes.

### D. Medical examiner's testimony

{¶ 21} Dr. Erica Armstrong, the deputy medical examiner and a forensic pathologist for the Cuyahoga County Medical Examiner's Office, conducted the autopsies of Michael and Trina. She also examined Axel, the dog found dead at the scene.

{¶ 22} Michael had been shot in the middle of his forehead and in his left cheek. The bullet in his forehead traveled from front to back, right to left, and downward, exiting through Michael's left ear. Dr. Armstrong noted stippling around the entrance wound; the amount of stippling indicated that the gun muzzle was approximately two and one-half to three feet from Michael's head. No stippling was present around the entrance wound on Michael's cheek, but Dr. Armstrong noted "a little bit" of black discoloration around the edge of the wound. She testified that this looked like fouling, which would indicate that the gun muzzle was at close range, potentially inches away from Michael's face when the gun was fired. Dr. Armstrong concluded that the cause of death was "gunshot wounds of head, with skull and brain injuries."

{¶ 23} Trina also died from a gunshot to the head that caused skeletal, brain, and spinal-cord injuries. The bullet entered the back of Trina's head on the left side. Dr. Armstrong testified that although part of the bullet had lodged in Trina's skull, part of it had broken off, exited her scalp, and lodged in her right shoulder. Stippling around the entrance wound on Trina's skull suggested an intermediate range of fire—i.e., less than three feet.

{¶ 24} Dr. Armstrong took an X-ray of the dog's head and was able to see a bullet, confirming that the dog had been shot.

### E. Forensic evidence

{¶ 25} Cellular-phone analysis, location-data analysis, and surveillance video illustrated the timeline of events on April 14, 2017, and corroborated Keener's account of the crimes. At trial, the state introduced subscriber information and historical call data from three phone companies. The state also presented McAlpin's Google account information, including location and content data.

{¶ 26} FBI Special Agent Brian Young reviewed cell-phone records to determine whom McAlpin was in touch with on April 14, 2017, between 4:00 and 8:00 p.m. He concluded that during that period, there were several calls between McAlpin's cell phone and a number identified as Keener's.

{¶ 27} The records show that McAlpin's cell phone called Mr. Cars at 4:09 p.m. At 5:00 p.m., a customer called the shop and spoke to Trina for approximately three minutes. Albert Martin, a friend of the victims, left the shop at 5:03 p.m. At 5:21 p.m., Trina and Michael moved the two blocker vehicles into position, then went back into the shop.

{¶ 28} Around the same time, a few blocks away, McAlpin walked by the wireless-phone store toward Mr. Cars, wearing a dark hoodie, a ball cap, and red sweatpants. About a minute later, Keener was seen walking in the direction of Mr. Cars. At 5:22 p.m., McAlpin's phone was used to make a 39-second call to Keener's phone.

{¶ 29} At 5:24 p.m., McAlpin walked into Mr. Cars. After McAlpin entered, no one entered or left over the next hour and six minutes.

{¶ 30} The customer who spoke to Trina at 5:00 p.m. called Mr. Cars again at 5:30 p.m. He testified that when Trina answered the phone, she was talking "very low and quiet." This struck him as odd because Trina was not a soft-spoken individual. This was the last confirmed contact with either Trina or Michael.

{¶ 31} Between 5:22 and 6:47 p.m., 13 calls between McAlpin's and Keener's phones were made, using cell towers in the general area around Mr. Cars. Security video showed that McAlpin walked out of Mr. Cars at 6:31 p.m., back inside a minute later, and then out again a minute after that. He then moved one of the blocker cars away from the exit.

{¶ 32} At 6:41 p.m., McAlpin went back into the shop. He then left the shop carrying something, walked to the Mercedes, and placed the object he was carrying in the vehicle. McAlpin then walked to the BMW, got into the driver's seat, and moved the car along the side of the shop. Keener walked to the Mr. Cars lot and got into the Mercedes. Both cars then drove off.

{¶ 33} From 7:00 to 7:30 p.m. and again between 8:07 and 8:43 p.m., there was no cellular data for McAlpin's cell phone. However, during that timeframe, Keener's cell phone moved north and then to the west side of Cleveland. Beginning at 8:22 p.m., McAlpin's Google account started generating location information again, showing his phone moving in the same direction as Keener's phone. At 8:43 p.m., Google location data placed McAlpin's phone at West 48th Street. Around 9:00 p.m., phones belonging to McAlpin, Keener, and Keener's girlfriend were all in the area of West 48th Street.

{¶ 34} On April 5, 2017, McAlpin's Google account was used to search for information about firearms and different calibers. Then, in the early hours of April 15, the account was used to search for information on salvaging a 2008 BMW and switching title to a vehicle without the owner's permission. Following the murders,

McAlpin's Google account was used on several occasions to search for news regarding the theft and murders that took place at Mr. Cars.

## F. DNA evidence

{¶ 35} Laura Evans, a forensic DNA analyst with the Cuyahoga County Medical Examiner's Office, testified that the DNA profile from the modem in the back office of Mr. Cars was a mixture of DNA from different people, that McAlpin was the major contributor to the mixture, and that the match was "307 octillion times more probable than a coincidental match to an unrelated African American person."

{¶ 36} Evans testified that the swabs from the back pockets of Michael's jeans contained a mixture of DNA and that McAlpin's DNA profile was a match "26.8 trillion times more probable than a coincidental match to an unrelated African American person."

{¶ 37} McAlpin's DNA profile also matched two swabs from inside the stolen BMW. Evans testified that a swab from the steering wheel was a match to McAlpin "2.35 septillion times more probable than a coincidental match to an unrelated African American person." And a swab from the driver's door interior was a match to McAlpin "394,000 times more probable than a coincidental match to an unrelated African American person."

## II. PROCEDURAL HISTORY AND SENTENCING

{¶ 38} McAlpin was charged with four counts of aggravated murder. In Count 1, he was charged with the aggravated murder of Trina while committing aggravated robbery and/or kidnapping and/or aggravated burglary. In Count 2, the state charged McAlpin with the aggravated murder of Michael while committing aggravated robbery and/or kidnapping and/or aggravated burglary. Counts 3 and 4 charged McAlpin with aggravated murder with prior calculation and design as to Trina and Michael, respectively.

{¶ 39} Each aggravated-murder count carried the following death-penalty specifications: course of conduct involving multiple murders, R.C. 2929.04(A)(5); murder during a kidnapping and the offender either was the principal offender or committed the offense with prior calculation and design, R.C. 2929.04(A)(7); murder during an aggravated burglary and the offender either was the principal offender or committed the offense with prior calculation and design, R.C. 2929.04(A)(7); murder during an aggravated robbery and the offender either was the principal offender or committed the offense with prior calculation and design, R.C. 2929.04(A)(7); and murder committed while under detention or while at large after breaking detention, R.C. 2929.04(A)(4). Counts 1 through 4 also contained specifications for having a firearm under the offender's control, R.C. 2941.141(A), and for having a firearm under the offender's control and displaying, brandishing, indicating possession, or using it, R.C. 2941.145(A).

{¶ 40} Counts 5, 8, 9, 11, 17, and 19 charged McAlpin with two counts each of aggravated robbery, aggravated burglary, and felonious assault as to Trina. Counts 6, 7, 10, 12, 18, and 20 charged McAlpin with aggravated robbery, aggravated burglary, and felonious assault as to Michael. Counts 13 and 14 charged McAlpin with kidnapping Trina and Michael, respectively. Each of these counts carried two firearm specifications, a notice-of-prior-conviction specification, and a repeat-violent-offender specification.

{¶ 41} Counts 15 and 16 charged McAlpin with murdering Trina and Michael, respectively, as a proximate result of committing or attempting to commit a felonious assault as a first-degree or second-degree felony. Both counts also carried two firearm specifications. McAlpin was also charged with having a weapon while under disability (Count 21), grand theft (Counts 23 and 24), injuring animals (Count 25), and cruelty to animals (Count 26).

{¶ 42} McAlpin pleaded not guilty to all charges. He elected to try the weapons-under-disability charge and the notice-of-prior-conviction and repeat-

violent-offender specifications to the court, which found him guilty on each. The remaining counts were tried to a jury, with McAlpin representing himself from voir dire through the mitigation hearing. The jury found McAlpin guilty as to the remaining counts and specifications.

**{¶ 43}** The state elected to proceed to mitigation on the aggravated-murder charges in Counts 1 and 2, each with three capital specifications for course of conduct, for committing the aggravated murder while committing aggravated burglary, and for committing the aggravated murder while committing aggravated robbery. The jury recommended that McAlpin be sentenced to death for both counts of aggravated murder. The trial court imposed death sentences for Counts 1 and 2 plus a consecutive three-year term for the firearm specification on each. The court then sentenced McAlpin on the noncapital offenses to an aggregate term of 63 years in prison.

## III. ANALYSIS

### A. Right to self-representation

**{¶ 44}** McAlpin waived counsel on July 19, 2018, and thereafter represented himself at all pretrial hearings, during voir dire, and throughout his trial and sentencing. In his first proposition of law, McAlpin argues that a capital defendant's Sixth Amendment right to waive counsel does not extend to proceedings that are unique to a capital trial, such as death-qualification voir dire and mitigation. McAlpin also urges this court to interpret the Ohio Constitution as limiting the right to self-representation in capital cases.

#### *1. Sixth Amendment*

**{¶ 45}** The Sixth and Fourteenth Amendments to the United States Constitution guarantee that every criminal defendant brought to trial in any state has the right to the assistance of counsel in his defense. *Faretta v. California*, 422 U.S. 806, 807, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). "[T]he Sixth Amendment right to the assistance of counsel implicitly embodies a 'correlative right to dispense

with a lawyer's help.' " *Id.* at 814, quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279, 63 S.Ct. 236, 87 L.Ed. 268 (1942). Thus, "[t]he Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense." *Id.* at 819.

{¶ 46} "*Faretta*'s holding was based on the long-standing recognition of a right of self-representation in federal and most state courts, and on the language, structure, and spirit of the Sixth Amendment." *McKaskle v. Wiggins*, 465 U.S. 168, 174, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984). Acknowledging that the right to defend is personal, *McKaskle* concluded that "[t]he right to appear *pro se* exists to affirm the dignity and autonomy of the accused and to allow the presentation of what may, at least occasionally, be the accused's best possible defense." *Id.* at 176-177.

{¶ 47} A timely request to waive counsel and self-represent must be granted "when [a defendant] voluntarily, and knowingly and intelligently elects to do so," *State v. Gibson*, 45 Ohio St.2d 366, 345 N.E.2d 399 (1976), paragraph one of the syllabus. However, the right to represent oneself is not unlimited. For instance, before permitting self-representation, the trial court must ensure that a defendant is "aware of the dangers and disadvantages of self-representation" so that " 'he knows what he is doing and his choice is made with eyes open.' " *Faretta* at 835, quoting *Adams* at 279; *see also Indiana v. Edwards*, 554 U.S. 164, 175-176, 178, 128 S.Ct. 2379, 171 L.Ed.2d 345 (2008) (defendant with severe mental illness who cannot perform basic necessary tasks may be denied self-representation). And there is no Sixth Amendment right to waive counsel for a direct appeal. *Martinez v. Court of Appeal*, 528 U.S. 152, 164, 120 S.Ct. 684, 145 L.Ed.2d 597 (2000).

### 2. Analysis

{¶ 48} The United States Supreme Court has not considered whether the right to self-representation, guaranteed by the Sixth Amendment, applies to capital cases as a whole, including death-qualification voir dire and sentencing. Significantly, however, the court has clarified that the Sixth Amendment right to

effective counsel applies at all sentencing hearings. "A capital sentencing proceeding * * * is sufficiently like a trial in its adversarial format and in the existence of standards for decision * * * that counsel's role in the proceeding is comparable to counsel's role at trial—to ensure that the adversarial testing process works to produce a just result under the standards governing decision." *Strickland v. Washington*, 466 U.S. 668, 686-687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

{¶ 49} Many state and federal courts have upheld the right to self-representation at all stages of a capital trial. "[T]he penalty phase is merely another stage in a unitary capital trial, and the Sixth Amendment right to counsel and corresponding right to self-representation is not vitiated during the penalty phase." *People v. Mickel*, 2 Cal.5th 181, 209, 211 Cal.Rptr.3d 601, 385 P.3d 796 (2016). "Sentencing is part of criminal prosecution, and the Sixth Amendment of course applies to capital sentencing proceedings—were it not so, a defendant would have neither the right to self-representation nor the right to counsel." *United States v. Roof*, 225 F.Supp.3d 394, 400 (D.S.C.2016); *see also Cassano v. Shoop*, 1 F.4th 458, 6th Cir. No. 18-3761, 2021 WL 2460980 (June 17, 2021) (denial of the defendant's request to represent himself at capital trial, without holding a hearing to determine whether his waiver of counsel was knowing, intelligent, and voluntary, violated the defendant's Sixth Amendment right to self-representation); *United States v. Davis*, 285 F.3d 378, 384 (5th Cir.2002); *Nelson v. Alabama*, 292 F.3d 1291, 1297 (11th Cir.2002); *Silagy v. Peters*, 905 F.2d 986, 1007 (7th Cir.1990) ("no principled reason" exists to deny self-representation in capital cases); *People v. Dent*, 30 Cal.4th 213, 218, 132 Cal.Rptr. 527, 65 P.3d 1286 (2003) (reversing death sentence because the trial court denied self-representation for the "improper" reason that it was a capital case); *Duncan v. United States*, D.Idaho No. 2:17-cv -00091-EJL, 2019 WL 1320039, *17 (Mar. 22, 2019); *Lay v. Trammell*, N.D.Okla. No. 08-CV-617-TCK-PJC, 2015 WL 5838853, *22 (Oct. 7, 2015).

**{¶ 50}** We have upheld death sentences in cases in which the defendant represented himself, but we have not explicitly addressed whether *Faretta* applies to the mitigation phase of capital sentencings. *See State v. Obermiller*, 147 Ohio St.3d 175, 2016-Ohio-1594, 63 N.E.3d 93, ¶ 28 (noting that "both the United States Supreme Court and this court have applied *Faretta* in capital cases and have acknowledged that valid waivers of counsel in capital cases will be upheld"); *State v. Jordan*, 101 Ohio St.3d 216, 2004-Ohio-783, 804 N.E.2d 1, ¶ 30-31 (upholding waiver of counsel in capital case). In a 2002 capital case, we observed:

> Ruling as [the] appellant requests would undermine the constitutional guarantee to self-representation identified in *Faretta* that we followed in *Gibson*[, 45 Ohio St.2d 366, 345 N.E.2d 399]. The fact that [the] appellant's decision to waive counsel and represent himself at trial was "not a good idea" is not the standard by which courts adjudicate this issue. Self-representation by a defendant is seldom "a good idea." Both the state and federal Constitutions, however, guarantee such a right to defendants with a valid waiver of counsel, regardless of the wisdom of such a decision.

*State v. Taylor*, 98 Ohio St.3d 27, 2002-Ohio-7017, 781 N.E.2d 72, ¶ 53.

**{¶ 51}** McAlpin's argument relies heavily on the analysis in *Martinez*, 528 U.S. at 164, 120 S.Ct. 684, 145 L.Ed.2d 597. The question presented in *Martinez* was whether the right to self-representation extends to direct appeals. To answer that question, *Martinez* examined the three bases on which *Faretta* had held that the Sixth Amendment guarantees the right to self-representation at trial. *Martinez* at 154, 156-160.

**{¶ 52}** First, the *Martinez* court found that there was no historical evidence of a "long-respected right of self-representation" in appellate proceedings. *Id.* at

159. In contrast, *Faretta* had found persuasive the robust historical evidence of the right to self-representation in trial proceedings. *Faretta*, 422 U.S. at 832, 95 S.Ct. 2525, 45 L.Ed.2d 562. The *Martinez* court declined to interpret this "historical silence" as probative evidence of the right to self-representation in the appellate context, observing that "the right of appeal itself is of relatively recent origin." *Martinez* at 159.

{¶ 53} Second, the text of the constitutional amendment offered no support: "The Sixth Amendment identifies the basic rights that the accused shall enjoy in 'all criminal prosecutions.' They are presented strictly as rights that are available in preparation for trial and at the trial itself." *Id*. at 159-160, quoting the Sixth Amendment to the U.S. Constitution. McAlpin contends that just as the text of the Sixth Amendment does not support a self-representation right in the appellate process, it does not support a self-representation right for the entirety of capital proceedings. He points to the statement in *Martinez* that "[t]he status of the accused defendant, who retains a presumption of innocence throughout the trial process, changes dramatically when a jury returns a guilty verdict," *id.* at 162, and contends that it shows that the Supreme Court has interpreted the Sixth Amendment's text as applying only to the traditional trial phase.

{¶ 54} However, McAlpin's interpretation is incorrect. As noted above, *Martinez* distinguished between appeals, to which *Faretta* does not apply, and trial proceedings. But sentencing must be considered part of the trial. At sentencing, the capital defendant is still defending against a certain punishment and the state still has the burden to prove that the aggravating circumstances outweigh the mitigating factors. A capital sentencing proceeding is "like a trial in its adversarial format and in the existence of standards for decision," so "counsel's role in the proceeding is comparable to counsel's role at trial." *Strickland*, 466 U.S. at 686-687, 104 S.Ct. 2052, 80 L.Ed.2d 674. By contrast, on appeal, the defendant is no longer trying "to fend off the efforts of the State's prosecutor but rather to overturn

14

a finding of guilt made by a judge or a jury below." *Ross v. Moffitt*, 417 U.S. 600, 610, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974). In short, a capital sentencing hearing is a trial-like proceeding held before the trier of fact during which the underlying facts continue to play a central role in the jury's yet-to-be-made sentencing determination. This is fundamentally different from an appeal, which is predominantly about the law and the factual determinations previously made.

{¶ 55} And while we agree that the bifurcated capital trial did not exist when the Sixth Amendment was adopted, it does not necessarily follow that the right to self-representation does not apply to the mitigation phase of modern-day capital proceedings. "Any attempt to determine the application of a constitutional provision to a phenomenon that did not exist at the time of its adoption * * * involves some degree of estimation—* * * but that is hardly a reason not to make the estimation as accurate as possible." *Crawford v. Washington*, 541 U.S. 36, 52, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), fn. 3.

{¶ 56} Finally, *Martinez* balanced the interest in individual autonomy against "the government's interest in ensuring the integrity and efficiency of the trial." 528 U.S. at 162, 120 S.Ct. 684, 145 L.Ed.2d 597. The court determined that that balance weighed in favor of the government's interest in fairness and due process because "[t]he status of the accused defendant, who retains a presumption of innocence throughout the trial process, changes dramatically when a jury returns a guilty verdict." *Id*.

{¶ 57} As to the third *Martinez* factor, McAlpin argues that the "public's interest in fairness, efficiency, and reliability is at its apex" in a capital trial, including voir dire and the mitigation phase, and that allowing a defendant to represent himself "undermines rather than furthers due process." But these public interests do not trump the defendant's right to control his defense. We have adhered to that principle by affirming a capital defendant's right to waive mitigation, as long as he is mentally competent to do so. *State v. Ashworth*, 85 Ohio St.3d 56, 706

N.E.2d 1231 (1999), paragraphs one and two of the syllabus. In a capital case, the decision to waive one's right to present evidence in mitigation is arguably more vital than whether to represent oneself. However, neither this court nor the United States Supreme Court has suggested that the Eighth Amendment's requirement of heightened reliability in capital cases requires forcing an unwilling defendant either to present mitigation evidence or to accept representation in a capital case. In both instances, the defendant's fundamental interest in autonomy is paramount.

{¶ 58} Applying the three *Martinez* factors shows that the Sixth Amendment's right to self-representation extends to capital trials, including to proceedings unique to capital trials such as death-qualification voir dire and the mitigation hearing. The state and federal courts that have addressed this question have resoundingly held the same. Therefore, we reject McAlpin's claim that the right to self-representation does not extend to all phases of a capital trial.

### 3. Ohio Constitution

{¶ 59} McAlpin argues that we should, under Article I, Section 10 of the Ohio Constitution, hold that a capital defendant has no right to self-representation for death-qualification voir dire and the mitigation hearing. In relevant part, Article I, Section 10, provides that "[i]n any trial, in any court, the party accused shall be allowed to appear and defend in person and with counsel."

{¶ 60} Although the Ohio Constitution is a document of independent legal force, *Humphrey v. Lane*, 89 Ohio St.3d 62, 68, 728 N.E.2d 1039 (2000), the state may not provide a criminal defendant with fewer rights than the United States Constitution grants. "In the areas of individual rights and civil liberties, the United States Constitution, where applicable to the states, provides a floor below which state court decisions may not fall." *Arnold v. Cleveland*, 67 Ohio St.3d 35, 616 N.E.2d 163 (1993), paragraph one of the syllabus. We therefore find McAlpin's argument that the Ohio Constitution limits the right to self-representation not well taken.

16

{¶ 61} We reject McAlpin's first proposition of law.

### B. Interference of standby counsel

{¶ 62} As his second proposition of law, McAlpin argues that his standby counsel interfered with his trial preparation and strategy by determining that a defense expert DNA report should not be prepared because it would not be beneficial to McAlpin's case, without allowing McAlpin to make the choice for himself, and by failing to inform the court-appointed defense expert that McAlpin had the right to make decisions on his own behalf. McAlpin contends that standby counsel's alleged interference denied him his Sixth Amendment right to self-representation and that this denial constituted structural error. In response, the state argues that McAlpin forfeited his complaint about not having the expert DNA report by failing to raise it in a timely manner. The state also contends that even if "McAlpin [had] made a timely complaint * * * over his inability to obtain the DNA report," having the report would not have altered the outcome of trial.

### *1. Relevant law*

{¶ 63} "The right to appear pro se exists to affirm the dignity and autonomy of the accused." *McKaskle*, 465 U.S. at 176-177, 104 S.Ct. 944, 79 L.Ed.2d 122. Self-representation was typical at common law and remains a viable corollary right to the Sixth Amendment right to counsel, "however counterproductive that course may be." *McCoy v. Louisiana*, __ U.S. __, __, 138 S.Ct. 1500, 1507, 200 L.Ed.2d 821 (2018). A criminal defendant who chooses to represent himself or herself has no Sixth Amendment right to standby counsel. *State v. Hackett*, 164 Ohio St.3d 74, 2020-Ohio-6699, 172 N.E.3d 75, ¶ 8. However, when a trial court does appoint standby counsel, there are limits on how involved counsel may be while assisting a self-represented defendant. *Id*. at ¶ 10.

{¶ 64} *McKaskle* articulated two limits on participation by standby counsel. First, standby counsel must allow the defendant to "actual[ly] control * * * the case he chooses to present to the jury." *Id.* at 178. This is the "core of the *Faretta* right,"

*id.*, and demands that the self-represented defendant "be allowed to control the organization and content of his own defense, to make motions, to argue points of law, to participate in voir dire, to question witnesses, and to address the court and the jury at appropriate points in the trial," *id*. at 174. If standby counsel "make[s] or substantially interfere[s] with any significant tactical decisions, or * * * control[s] the questioning of witnesses, or * * *speak[s] *instead* of the defendant," the defendant's right to self-representation has been violated. (Emphasis sic.) *Id*. at 178. Second, "participation by standby counsel without the defendant's consent should not be allowed to destroy the jury's perception that the defendant is representing himself." *Id*. Standby counsel violates this tenet if they become "excessive[ly] involve[d]" in the trial such that the jury's perception of the defendant's autonomy is undermined. *Id*. at 181-182.

{¶ 65} A violation of a defendant's right to self-representation is considered structural error. *See id.* at 177, fn. 8. A structural error " 'affect[s] the framework within which the trial proceeds,' rather than being 'simply an error in the trial process itself.' " *Weaver v. Massachusetts*, __ U.S. __, __, 137 S.Ct. 1899, 1907, 198 L.Ed.2d 420 (2017), quoting *Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). Structural errors "defy analysis by 'harmless-error' standards," *Fulminante* at 309, for three reasons: (1) "the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest," *Weaver* at 1908, (2) "the effects of the error are simply too hard to measure," *id.*, and (3) "the error always results in fundamental unfairness," *id*. But a structural error need not satisfy all three criteria: "An error can count as structural even if the error does not lead to fundamental unfairness in every case." *Id*.

{¶ 66} As we have observed more than once, the plain-error rule still applies to errors that were never objected to at trial, even if those errors can be classified as structural. *See State v. Hill*, 92 Ohio St.3d 191, 199, 749 N.E.2d 274 (2001)

(noting that the United States Supreme Court has "found that it had no authority to create a 'structural error exception' to the [plain-error] rule, and seemed to hold that, in direct appeals from federal convictions, a structural error analysis is inappropriate in a plain-error situation"), citing *Johnson v. United States*, 520 U.S. 461, 466, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997); *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 59 (holding that "counsel's failure to object to the closing of the courtroom constitutes a waiver of the right to a public trial"). Because McAlpin failed to timely object to the alleged error, our review is subject to the plain-error standard. To establish plain error, McAlpin must show that an error occurred, that the error was obvious, and that there is "a reasonable *probability* that the error resulted in prejudice," meaning that the error affected the outcome of the trial. (Emphasis sic.) *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22. As discussed in more detail below, the facts do not establish that McAlpin was prejudiced by standby counsel's involvement. Thus, McAlpin cannot show plain error.

### 2. Relevant facts

#### a. Pretrial through trial-phase proceedings

{¶ 67} On July 19, 2018, the trial court accepted McAlpin's waiver of counsel and appointed his defense attorneys as standby counsel. Standby counsel stated that they wanted to make sure that all motions filed on McAlpin's behalf under the previous case number were transferred to the current case in the event that McAlpin wanted to argue them. Among other things, counsel had filed a motion for discovery of biological testing on McAlpin's behalf and had retained Forensic Bioinformatic Services to conduct a DNA analysis. Counsel also had retained a forensic digital expert, a private investigator, a mitigation specialist, and a psychologist.

{¶ 68} At a pretrial hearing on July 24, 2018, McAlpin informed the trial court that he had not spoken to any of the experts that his standby counsel had hired

for him. McAlpin asserted, "[N]ow that I am representing myself, all things that [are] forwarded from [the defense investigator] should come directly to me and not anyone else, and I want to get that understanding." Standby counsel agreed to ask the private investigator to visit McAlpin at the jail.

{¶ 69} At a hearing on July 25, McAlpin asked about his DNA expert and told the trial court that he had "no names, no credentials, no paperwork, no motions, no discovery, or any of the sort from [his] side" and that he was "totally lost." He elaborated, "I don't know anything about the C[V]s, I don't know anything about certain experts or certain credentials that I need to be aware of, so that's what I speak about being lost. Not procedural, but actual things that should have been [taking] place once I had counsel."

{¶ 70} During a hearing on August 1, standby counsel stated, "[A]t no time ha[ve we] concealed or held back discovery for Mr. McAlpin; it's always been available." Standby counsel averred that they had provided McAlpin with all the information on the experts they had retained. And although they had already given McAlpin the DNA expert's curriculum vitae, standby counsel agreed to provide it again. McAlpin explained that the jail routine was keeping him from calling experts. The state responded that it would talk to the jail's sheriff about "getting McAlpin phone access for witnesses or experts."

{¶ 71} At a hearing on August 8, McAlpin said that he had "access to * * * the DNA expert, but yet at the same time [was] being forced to use a phone [that was] not a secure line." The state acknowledged that jail phone calls are recorded but agreed not to listen to McAlpin's calls with any experts.[1]

{¶ 72} At McAlpin's request, on August 23, the trial court appointed two new standby counsel in place of McAlpin's original standby counsel.

---

1. The trial court stated that it would issue an order preventing the state from listening to any calls between McAlpin and an expert. No such order appears in the record.

**{¶ 73}** On September 19, the state asked McAlpin's new standby counsel to make sure that McAlpin understood the rules regarding expert reports. McAlpin told the court that he had not yet gotten in touch with the DNA expert but that he "no longer need[ed] any more continuances and [was] prepared to go to trial." He repeated a second time during that hearing that he was ready for trial.

**{¶ 74}** As of November 2018, McAlpin had not been able to talk to the DNA expert and the expert was still waiting for the state to provide additional information. Hearing this, standby counsel promised to "grab the bull by the horns on the DNA and * * * make sure that everything is proceeding." McAlpin then told the trial court, "I don't understand why [there is] such a drag with the trial [date]. I've been prepared."

**{¶ 75}** By February 7, 2019, McAlpin still had not talked to the DNA expert. The state averred that the expert had requested "additional discovery regarding the swabs" from Diggs, Keener, and the stolen Mercedes. The state indicated that it was preparing a supplemental packet of discovery and that it would provide McAlpin with copies. McAlpin responded that he had neither spoken to nor received any mail from the defense DNA expert. There was no further mention of the defense DNA expert before trial began on March 26, 2019.

**{¶ 76}** The expert was mentioned only once during trial, just before Keener testified. At that juncture, the state orally moved to have McAlpin deliver any other evidence, including the defense DNA report, to the state immediately. The trial court denied the state's motion because McAlpin stated that he had disclosed everything he had and that he did not have a DNA report.

**{¶ 77}** On April 16, 2019, the jury returned its verdict finding McAlpin guilty of all counts and specifications in the superseding indictment.

*b. Motion for a new trial*

**{¶ 78}** On April 29, McAlpin filed a motion for a new trial and requested a hearing on the motion. Most of McAlpin's new-trial motion argued prosecutorial

misconduct. However, McAlpin also argued that Evans, the state's DNA expert, committed misconduct when she testified that McAlpin's DNA profile was found "on a modem, on a pocket and on a steering wheel." McAlpin asserted that he had reviewed Evans's "work" and that he had actually been "*excluded* from being a contributor of DNA to the modem and the pocket." (Emphasis sic.) McAlpin contended that he would have been acquitted if not for Evans's untruthful testimony.

{¶ 79} The state filed a memorandum opposing McAlpin's new-trial motion. With respect to McAlpin's claims about Evans's testimony, the state responded that McAlpin was not qualified as an expert and thus could not himself offer testimony on DNA analysis. In his reply, McAlpin argued that he would "show the accuracy of his argument of the DNA results," but he did not explain how.

*c. Hearing on McAlpin's motion for a new trial*

{¶ 80} On May 13, 2019, the court heard McAlpin's motion for a new trial. McAlpin argued:

I'm only going to reiterate what [Evans] said inside of her testimony that was already given with evidence of the DNA profiles in this case. Th[e profiles] w[ere] never admitted into evidence, only results w[ere] admitted into evidence.

And I will take the stand to reiterate exactly word for word, quote for quote what a match is. How do you generate a match? Then I will go and give copies of—I would enter into evidence each DNA profile, for every DNA profile that was allegedly associated with mine and we saw a great contradiction that may make the Court to bring Ms. Evans in here to give an understanding as to the

findings that has been considered as newly discovered evidence under Criminal Rule 33.

I'm not an expert. * * * But I can reiterate testimony that was already given with evidence.

The trial court denied McAlpin's request to take the stand.

{¶ 81} After the parties' arguments concluded, the trial court ruled from the bench, denying McAlpin's motion for a new trial. The mitigation hearing began that day.

*d. May 16, 2019 hearing*

{¶ 82} On the third day of the mitigation phase, before the jury was seated, McAlpin informed the trial court that he had an issue with his DNA expert. He stated that he had been asking one of his standby counsel, Kevin Cafferkey, for the expert's report "during trial and also after the trial." According to McAlpin, when he asked about the DNA report during trial, Cafferkey said that a report would not be helpful to the defense. McAlpin continued:

On 5/5/19, Mr. Cafferkey came to see me [at the jail]. That was the first time he gave me a copy of the DNA profiles that was from Ms. Carrie Roland * * *. And when he gave me these DNA profiles, I asked * * * w[ere] there any reports that go with [the profiles]?

He said no, he didn't need a report. It was harmful. The prosecution doesn't know about [Roland's profiles]. We're going to keep these to [ourselves]. We're not going to let them know that we had these DNA profiling. I thought it was kind of odd and weird.

On the next day, * * * I called [Cafferkey]. I let him know that * * * I didn't receive the report, and I wanted the report from the expert.

* * *

* * * He said, okay, I'm going to give it to you.

Then on 5/8, I called [Cafferkey] * * * on a recorded call. I called him on a three-way with my relative. I asked him once again, hey, I want the report because I need that for my Monday new trial hearing.

That was the reason why I wasn't able to give forth my * * * newly discovered [DNA] evidence. * * * He never brought it. Then on 5/9/19 * * * [both standby counsel] * * * came to see me and we had a phone call with * * * Roland.

Now, this whole time that I had the motion for expert that was granted, * * * for the DNA expert from [my original standby counsel] * * * I was under the impression that I was receiving an expert by the name of Dan E. Crane.

* * *

* * * That's who I thought I had as an expert. The numbers that [were] given to me on inside of the motion [were] the numbers I was calling throughout the trial, and I was telling [the court] on record I'm not able to get in touch with my DNA expert.

So, we were on the phone on 5/9/19, the visit with my standby counsel, we were on the phone with Ms. Roland.

I [took her] number down myself because I wanted to talk to her. She was explaining some things to me about the DNA profile that didn't make sense to me.

So, I wanted to talk to her myself and I asked her where was the report.  * * *

[She said] I didn't think that whoever hired me wanted to pay me for a report that wasn't in your favor.  * * *  I said I'm the acting attorney.  I'm the one who's responsible for you.  She sa[id], well, okay, I understand.  * * *

* * *

Then on 5/15/19, * * * on a recorded call, I called [Cafferkey and my family], and asked him why I haven't received a report from the expert yet?

* * * [He said] oh, don't worry about the reports, Joe.  You don't need them.  It's not going to work for you.

* * *

Later on that day, on 5/15/19, * * * I called the DNA expert, Ms. Carrie Roland via three-way [with] my family member.  And I asked her what was the date that you gave Mr. Cafferkey those reports, the DNA profiles?

She was, like, is [Cafferkey] on the phone?  I said no.  She said well, [Cafferkey] told me I'm not allowed to talk to you or anybody else unless he's present.

I said, whoa.  * * *  I'm the acting attorney.  * * *  You're my expert.  She said, well, I'm only allowed to talk to the person who's payin[g] me.  [Cafferkey is] the one paying me.  I say he's not payin[g], the Court's paid you.  And I'm the acting attorney.

[She said] well, I don't want to cross [any] lines, and I can't talk to you unless he's present.  * * *

[Cafferkey] came and visited me.  I asked him about it.  He de[nied] it.  * * * I don't believe Ms. Roland would just make up that lie.

* * *

There's no way possible [if I am the] acting attorney [that] Mr. Kevin Cafferkey can stop me from getting a report after I asked for it.

He can advise me all he wants.  But if I say no, I want something, he was supposed to give that to me.

* * *

It's no way possible after I asked a multitude of times during trial, and after trial for me to have the report.  I never received it which would enable me to have—to properly cross-examine Ms. Evans.

I would like to renew my motion for a new trial due to the newly discovered information, and also by the recorded calls that can back this up.  Documentation beats conversation.

{¶ 83} The trial court gave Cafferkey an opportunity to respond, but he declined to speak because of attorney-client privilege.  The prosecutor then stated, "Sounds like good lawyering to me.  Sounds like his independent DNA expert came up with some answers that were not favorable to him, and they didn't want to confirm his guilt any more than it already had been confirmed during trial, so they told the expert not to prepare a report."  In response, McAlpin said that standby counsel was supposed to be only "an adviser," that there is no hybrid counsel, and that what standby counsel did was prohibited when McAlpin was representing himself.

**{¶ 84}** The court then stated, "Well, you're right now. There's no hybrid counsel. But everything that you put on the record here was after the jury had already returned its verdict." The court continued, "Earlier in this case, you had been complaining about not being able to talk to the expert because you were in jail. * * * We tried to work around that somehow. * * * [T]hen ultimately, you had now found a way to do it. You'd been contacting these experts directly. Why didn't you do that two or three months ago is beyond my [ken]." The court concluded that McAlpin had waited too long to raise this issue, saying: "This is a conversation we should have had a month or two ago. We are going to finish the case today." In response, McAlpin said that he had only just found out that standby counsel had hired someone new and that he had been mistakenly trying to call the expert that his former counsel had hired.

**{¶ 85}** Standby counsel added that they had not retained a new DNA-expert company; Crane was the owner of Forensic Bioinformatic Services, and Roland worked in the lab there. When the trial court asked Cafferkey whether he had told Roland not to speak to McAlpin, Cafferkey responded, "Absolutely not." McAlpin reminded the court that the jail phone calls were recorded. But the trial court was unmoved, stating, "We've already got the decision on the base counts" and advised McAlpin that he had preserved the issue for appeal.

**{¶ 86}** On June 5, 2019, the trial court filed findings of fact and conclusions of law denying McAlpin's motion for a new trial. That document does not address the information presented by McAlpin at the May 16 hearing.

### 3. Analysis

**{¶ 87}** There is no dispute that McAlpin failed to object to standby counsel's alleged interference before the jury found him guilty. McAlpin contends that he could not have objected during trial, because he did not discover standby counsel's improper actions with the DNA expert until *after* the jury returned its verdict. But we reject this claim because regardless of standby counsel's conduct,

McAlpin could have objected to the trial's proceeding until he had contacted his expert to discuss the preparation of a report. Moreover, even as McAlpin complained that he had been unable to reach the expert or get the expert's report, he asked the trial court to schedule his trial. Under these circumstances, McAlpin's failure to make a timely objection has forfeited all but plain-error review of the claim. *See Weaver*, __ U.S. at __, 137 S.Ct. at 1910, 198 L.Ed.2d 420 (in case of structural error, when "there is an objection at trial *and* the issue is raised on direct appeal" the defendant generally is entitled to automatic reversal [emphasis added]).

{¶ 88} McAlpin's primary complaint is that standby counsel significantly interfered with a tactical decision—whether to have the defense DNA expert prepare a report—that foreclosed him from actually controlling his defense. The challenged conduct did not occur in front of the jury, and thus only *McKaskle*'s first limitation is implicated (i.e., standby counsel must allow the defendant to actually control his case).

{¶ 89} McAlpin argues that standby counsel made crucial decisions regarding the defense DNA expert, such as whether to have Roland prepare a report, without his participation or knowledge. McAlpin avers that he would have asked Roland to prepare a report and contends that standby counsel interfered with a core self-representation right—the right to make all tactical decisions regarding witnesses and evidence—by telling her not to.

{¶ 90} To find that a *McKaskle* error occurred here, we would have to assume the truth of McAlpin's statements and assume that standby counsel was untruthful when he told the trial court that he did not instruct Roland not to talk to McAlpin. The record before us does not support making such assumptions. But even if the record did support the conclusion that standby counsel interfered with McAlpin's right to self-representation, McAlpin could not establish plain error, because he cannot show a reasonable probability that but for standby counsel's actions, the jury would have acquitted him. *See Rogers*, 143 Ohio St.3d 385, 2015-

Ohio-2459, 38 N.E.3d 860, at ¶ 22. During the May 13, 2019 hearing on his new-trial motion, McAlpin stated that his goal was to undermine the testimony of the state's DNA expert. And at the May 16 hearing, McAlpin explained to the judge that he had wanted Roland to prepare a DNA report so that he could have used it to effectively cross-examine the state's expert. But there is no indication that had the report been prepared, it would have aided in cross-examination of the state's DNA expert. Indeed, even McAlpin's recollection of what Roland told him confirmed that the report, if made, would not have been favorable to him.

{¶ 91} For the foregoing reasons, we reject McAlpin's second proposition of law.

### C. Sufficiency of the evidence

{¶ 92} In proposition of law No. III, McAlpin contends that the state failed to prove beyond a reasonable doubt that he committed the murders with prior calculation and design. He maintains that the evidence was sufficient to establish that the murders were purposeful but insufficient to establish prior calculation and design.

{¶ 93} The standard of review for sufficiency of the evidence is well established. "When evaluating the adequacy of the evidence, we do not consider its credibility or effect in inducing belief. Rather, we decide whether, if believed, the evidence can sustain the verdict as a matter of law." *State v. Richardson*, 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993, ¶ 13. In reviewing for sufficiency, we must consider the evidence "in a light most favorable to the prosecution." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, *superseded by constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102, 684 N.E.2d 668 (1997), fn. 4.

{¶ 94} At issue here is whether the state presented sufficient evidence of the fifth and sixth capital specifications that were attached to both Counts 1 and 2. They alleged that McAlpin committed aggravated murder while he "was

committing, attempting to commit, or fleeing immediately after committing or attempting to commit * * * aggravated robbery, or aggravated burglary, and either the offender was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design," R.C. 2929.04(A)(7).

{¶ 95} The evidence that McAlpin was the principal offender in the commission of the aggravated murders was overwhelming. McAlpin's DNA was on items inside Mr. Cars, inside the back pocket of Michael's jeans, and on one of the stolen vehicles. Surveillance video shows McAlpin entering Mr. Cars, spending a lengthy period of time inside the building, leaving the building, and driving away in the BMW. Keener's testimony established that only McAlpin—not Diggs or Keener—entered the building. And cell-phone analysis showed that Keener and McAlpin contacted each other more than a dozen times immediately before and immediately after the murders. This evidence more than sufficiently supports the jury's verdict that McAlpin committed the murders as the principal offender. Thus, it is unnecessary to consider his claim that he did not commit the murders with prior calculation and design. We reject McAlpin's third proposition of law.

### D. Jury issues

{¶ 96} In proposition of law No. IV, McAlpin contends that a prospective juror was improperly excused for cause because he had reservations about capital punishment. And in proposition of law No. V, McAlpin maintains that the state exercised peremptory challenges to prospective jurors in a pattern that resulted in the improper dismissal of women.

### 1. Excusal of prospective juror No. 30

{¶ 97} One of the questions on the death-qualification questionnaire asked prospective jurors to rank their level of support for the death penalty on a scale of one to ten, with one being "strongly opposed" to the death penalty. Prospective juror No. 30 selected four out of ten.

{¶ 98} During individual voir dire, the trial court asked prospective juror No. 30 about some responses on his questionnaire. The juror explained, "I'm Catholic so I do have some kind of moral stance, but if it was a matter of can I objectively, like you said, weigh the evidence, I think I could." He added, "I've never * * * been faced with that decision and to be honest, I don't know how I would feel." The trial court explained that it had reviewed the prospective juror's questionnaire and sensed "a certain kind of ambivalence" in his responses.

{¶ 99} When questioned by the state, prospective juror No. 30 agreed that he had some reservations about capital punishment. And when asked whether those reservations "would [a]ffect [his] ability to serve as a juror in this case," he responded: "It might. * * * [I]t's always been something I've struggled with." He agreed with the prosecutor that his questionnaire response about the level of his opposition to the death penalty was "kind of in the middle, maybe a little bit leaning against."

{¶ 100} After describing the weighing process as subjective, the prosecutor asked prospective juror No. 30 whether he "would start out with [his] finger on the scale for the mitigation instead of the aggravation, against the death penalty?" Prospective juror No. 30 said, "I think I might," although it would be only a "slight difference." Ultimately, he told the prosecutor that he was not "a hundred percent certain" that he could sign a verdict imposing the death penalty on someone even if the state proved "the things that [the state would] have to prove."

{¶ 101} During McAlpin's examination, prospective juror No. 30 further explained: "[I]f I in my mind believe that the aggravating circumstances outweigh the mitigating circumstances, obviously by law, I would have to, but how I arrived to that, I don't know. You know, it's a subjective." He later said, "[I]f I'm leaning against the death penalty as a moral stance, and I'd be truly being objective and saying the aggravating circumstances, let's say I would say mitigating circumstances outweigh the aggravation, maybe I'm tipping the scales before I get

on." Even when McAlpin tried to rehabilitate him, prospective juror No. 30 responded, "[W]hen it comes specifically to the death penalty * * *, *I think that's where maybe I get a little wishy washy* * * *." (Emphasis added.)

{¶ 102} The state moved to excuse prospective juror No. 30 for cause because he "pretty clearly said that he would start out predisposed in favor of a life sentence." Over McAlpin's objection, the trial court excused prospective juror No. 30 for cause.

{¶ 103} The Sixth Amendment guarantees to a defendant the right to an impartial jury. As explained by the United States Supreme Court, this clause prevents the state from impaneling a jury that is "uncommonly willing to condemn a man to die." *Witherspoon v. Illinois*, 391 U.S. 510, 518, 521, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). "A prospective juror may not be excluded for cause simply because the prospective juror expresses reservations about imposing the death penalty." *State v. Madison*, 160 Ohio St.3d 232, 2020-Ohio-3735, 155 N.E.3d 867, ¶ 87. However, a trial court may exclude a prospective juror for cause if the juror's beliefs about capital punishment "would prevent or substantially impair" the juror's performance of duties in accordance with his or her instructions and oath. *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). A trial court may excuse a prospective juror for cause if the court "is left with the definite impression that [the] prospective juror would be unable to faithfully and impartially apply the law." *Wainwright v. Witt*, 469 U.S. 412, 425-426, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).

{¶ 104} A trial court's ruling on a challenge for cause should be upheld absent an abuse of discretion. *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 80, 86.

{¶ 105} McAlpin acknowledges that prospective juror No. 30 was "predisposed to favor life over death," but McAlpin contends that that does not mean that the prospective juror was substantially impaired. McAlpin maintains that

the law was not "adequately explained" to prospective juror No. 30 and that therefore, the juror did not know that "he may have a bias as long as he can set it aside and follow the law." In response, the state contends that prospective juror No. 30's responses during voir dire were ambiguous at best and that the trial court was within its discretion to resolve that ambiguity in the state's favor.

{¶ 106} McAlpin argues that even if a prospective juror tends to favor or disfavor the death penalty, the prospective juror is not substantially impaired unless it appears to the trial court that his or her "bias or lean would affect the juror[']s ability to follow the law." Though that is a correct statement of the law, the record shows that prospective juror No. 30 failed to affirmatively state that he could sign a death verdict if the state proved that the aggravating circumstances outweighed the mitigating evidence. The prospective juror's responses during voir dire were consistently ambiguous as to whether he could sign a death verdict. And "when there is ambiguity in the prospective juror's statements, 'the trial court, aided as it undoubtedly [is] by its assessment of [the venireman's] demeanor, [is] entitled to resolve it in favor of the State.' " (Brackets sic.) *Uttecht v. Brown*, 551 U.S. 1, 7, 127 S.Ct. 2218, 167 L.Ed.2d 1014 (2007), quoting *Witt*, 469 U.S. at 434, 105 S.Ct. 844, 83 L.Ed.2d 841. McAlpin's examination served only to demonstrate that prospective juror No. 30 would be able to impose one of the three life sentences but not the death sentence.

{¶ 107} McAlpin has not shown that the trial court abused its discretion by granting the state's motion to excuse prospective juror No. 30 for cause. Accordingly, we reject McAlpin's fourth proposition of law.

### 2. Use of peremptory challenges to dismiss women from the venire

{¶ 108} Following the death-qualification portion of voir dire, the trial court gave the state and McAlpin six peremptory challenges each, plus an additional two for alternates. The state used five of its six peremptory challenges, excusing four female prospective jurors and one male prospective juror. McAlpin used all six

available peremptory challenges, excusing three women and three men from the venire.

**{¶ 109}** McAlpin asserts that the state violated the Equal Protection Clause by using four peremptory challenges on female potential jurors. He states: "The unfairness here is based upon the possible belief by the prosecution that women, as a whole, may not be as eager to invoke the death penalty as men."

**{¶ 110}** Although it is possible to establish an equal-protection violation based on gender discrimination in voir dire, "a party alleging gender discrimination must make a prima facie showing of intentional discrimination before the party exercising the challenge is required to explain the basis for the strike." *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 144-145, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). McAlpin failed to object during voir dire to the state's use of its challenges to remove women. Thus, he has forfeited his challenge absent a showing of plain error. *State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, 9 N.E.3d 930, ¶ 91-92.

**{¶ 111}** McAlpin cannot show plain error. To begin, McAlpin merely speculates that the state believed that women were less likely than men to impose the death penalty. This speculation falls far short of establishing discrimination that would support an equal-protection challenge. Furthermore, the fact that many more female prospective jurors than male prospective jurors were called to the jury box for voir dire provides a logical and innocuous explanation for why more female prospective jurors were ultimately dismissed. After an initial group of prospective jurors was excused by the court, there remained a pool of 62 prospective jurors. Only 41 of those prospective jurors were called to the jury box for voir dire by the court (the remainder were excused by the court after the jury was seated). Of those 41 called to the jury box, 27 were women and 14 were men. Nine women and four men were excused for various reasons (employment, health, etc.), leaving the total number of prospective jurors at 18 women and ten men. After the state and

McAlpin each exercised their first round of peremptory challenges, nine women and five men remained seated in the jury box for voir dire. After the state passed on its second peremptory challenge, McAlpin excused one more male juror. After that, the court added four more prospective jurors, all of whom were female, resulting in 13 women and four men in the jury box for voir dire. The jury panel after voir dire and all challenges was made up of 11 women and five men. The fact that the state used its peremptory challenges to excuse more female prospective jurors than male prospective jurors makes sense under these circumstances. Because there were significantly more women who were called to the jury box to participate in voir dire, there was a greater likelihood that more female prospective jurors would be excused in the end. Thus, we reject McAlpin's fifth proposition of law.

### E. Improper admission of victim-impact evidence

{¶ 112} In his sixth proposition of law, McAlpin argues that the state elicited inadmissible victim-impact testimony from multiple witnesses during the trial phase, which resulted in unfair prejudice that carried over to the mitigation phase. Except when noted, McAlpin failed to object to the introduction of the allegedly inadmissible evidence and has forfeited all but plain error. *State v. Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, 114 N.E.3d 1092, ¶ 77.

{¶ 113} "Victim-impact evidence includes evidence relating to the victim's personal characteristics and the impact that the crimes had on the victim's family." *State v. Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, 172 N.E.3d 841, ¶ 113. The admission of such evidence is generally limited to the sentencing phase of the death-penalty proceedings. *Id.*, citing R.C. 2930.13, 2930.14(A), 2947.051, and Article I, Section 10(a)(A)(3), Ohio Constitution. We have allowed victim-impact testimony during the trial phase of a capital case "only when the evidence was relevant to the facts attendant to the offense." *Id.* at ¶ 113; *see also id.* at ¶ 136; Evid.R. 402 (evidence that is not relevant is not admissible). Such evidence should

not be overly emotional or directed to the penalty to be imposed. *Graham* at ¶ 113, 136; *see* Evid.R. 403(A) ("evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury").

{¶ 114} "Testimony is overly emotional when it is likely to inflame the passions of the jurors and elicit a purely emotional response that would inhibit the jurors from making an objective and rational determination regarding the defendant's guilt and/or the appropriate punishment." *Graham* at ¶ 123. Factors relevant in making that determination include "the length of the victim-impact testimony," "whether witnesses, jurors, and audience members showed physical signs of emotion during the testimony," "the detail and depth of the victim-impact testimony with regard to the murder victim[s]," and "whether the victim-impact witness used emotionally charged language." *Id*. at ¶ 126. This is not an exhaustive list. *Id*.

### 1. Colin Zaczkowski's testimony

{¶ 115} Colin Zaczkowski, Trina's son and Michael's stepson, testified that he was 19 years old at the time of the murders and that he and his then 13-year-old sister were living at home with their parents, Michael and Trina, in April 2017. Zaczkowski also testified that his younger stepbrother spent every other weekend with the family and was there with Zaczkowski and his sister on the night of the murders. Zaczkowski explained that Michael gave Axel, the family's dog, to Trina as a surprise and that Axel went to Mr. Cars every day.

{¶ 116} Zaczkowski testified that Michael and Trina had married when he was about five years old. They divorced eight years later but reunited three years after that. Zaczkowski said that his biological father died of an overdose in 2008, when Zaczkowski was 11.

{¶ 117} Zaczkowski testified that Mr. Cars was "basically the definition of a mom and pop shop. It was our family lifeline. * * * It was more of a home than

a business." He explained that Michael's father had started the business and transferred it to Michael around 2000. Mr. Cars was open between 10:00 a.m. and 6:00 p.m. during the week, but sometimes Michael and Trina would stay later if they needed to finish a repair or deliver a car. In April 2017, Zaczkowski was working full-time in Eastlake, but he sometimes stopped by Mr. Cars to help out. When asked why, Zaczkowski responded: "It was home. It was like stopping at home."

{¶ 118} McAlpin argues that much of Zaczkowski's testimony was both irrelevant and unnecessarily emotional. However, most of Zaczkowski's testimony did not touch on Michael's and Trina's personal characteristics or the impact that their murders had on their family and thus was not true victim-impact evidence. *Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, 172 N.E.3d 841, at ¶ 113. Zaczkowski's testimony that Mr. Cars was "like home" to him and his family was somewhat emotional, but it was brief.

{¶ 119} The state argues that Zaczkowski's testimony about his biological father's death was relevant to establish his state of mind when he found Michael's and Trina's bodies at the scene of the murders. But Zaczkowski's state of mind at the time he found the bodies is irrelevant in the context of McAlpin's guilt or innocence. *See id.* at ¶ 119 (finding irrelevant and inadmissible "victim-impact testimony from a justifiably grieving father during the guilt phase of the trial"). Thus, Zaczkowski's testimony about his biological father's overdose was inadmissible.

### 2. Albert Martin III's testimony

{¶ 120} Albert Martin met Michael and Trina in 2005 when he purchased a used car from Mr. Cars, and they later became "really good friends." For example, he testified that he previously had brought them a leg of lamb for Christmas and had spent New Year's with them. He called Michael his "brother from another mother."

{¶ 121} Martin testified that he was injured while serving in the Marines and had had ten surgeries; after the third, he began to abuse drugs. He testified that Michael and Trina gave him support and encouraged him to get back into rehab. Martin testified that Michael and Trina were "like a moral support," were caring, "liked people in general," and were "good people." Martin also testified that he had known their dog since he was a puppy and was fond of him. Martin testified that he "was disappointed, sad, [and] broken up" about the events at Mr. Cars.

{¶ 122} Much of Martin's testimony was emotion-laden and irrelevant. The state contends that the testimony was relevant to establishing that Martin was not the killer. But that was clearly established by Martin's testimony that he was at Mr. Cars on April 14 from approximately 10:00 a.m. to 5:00 p.m. He identified himself on surveillance video leaving the lot at 5:03 p.m.

{¶ 123} Evaluating Martin's testimony in light of the *Graham* factors demonstrates that his testimony was not likely to elicit an emotional response from the jury. He was one of 34 witnesses that the state called to prove its case. There is no indication in the record that Martin's testimony caused physical manifestations of emotion in the jury or audience.

### 3. Barbara Bonnes's testimony

{¶ 124} Barbara Bonnes, Michael's older sister, testified that on the night of April 14, 2017, her uncle called to tell her that she needed to get to her parents' house as soon as possible. She described the scene at her parents' house: "I realized that my brother was dead. My mom was hysterical, lying on the kitchen floor. My father was in shock. And the children, I kept asking where the children were." She was "very concerned about the children listening to everything that was going on," so she "swooped them up * * * and took them home for * * * the rest of the evening."

{¶ 125} Bonnes said that Michael and Trina's 13-year-old daughter had brought up her last phone call with her mom on April 14, 2017, "many, many times"

and "talks about it still all the time." Bonnes also testified that "Albert [Martin] and Trina and Michael were good friends." She said that "[h]e stopped by * * * on a daily basis, was very close with them, [and] would bring treats for the dog."

{¶ 126} McAlpin objects to Bonnes's testimony on relevance grounds, contending that while Bonnes's testimony is arguably relevant to the extent it establishes a timeline for the events in the case, the impact of the deaths on the surviving family members was in no way relevant to his guilt or innocence. He also contends that Bonnes's testimony about how Michael's death affected their family was inflammatory victim-impact testimony.

{¶ 127} Bonnes's testimony was not relevant to establishing a timeline of the night in question. She did not know when the daughter had last spoken to Trina, and she had no knowledge of the crimes. None of Bonnes's testimony made any fact of consequence more or less probable than it would have been without her testimony. *See* Evid.R. 401. The most emotional testimony from Bonnes was her recounting of the family's reaction to Michael's death. Because this testimony related only "the emotional impact of the crimes on the victim's family," *Payne v. Tennessee*, 501 U.S. 808, 817, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), it was victim-impact testimony and was not related to any issue of consequence. However, Bonnes's testimony was short and not overly emotional. *See Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, 172 N.E.3d 841, at ¶ 123, 126.

### 4. Andrew Keener's testimony

{¶ 128} Keener, a participant in the robbery at Mr. Cars, testified against McAlpin. During Keener's testimony, the prosecutor showed him crime-scene photographs of Michael and Trina and asked Keener what came to his mind when he looked at the pictures. Keener testified that he was worried that what he saw in the photographs would happen to him or someone in his family. But Keener was one of the robbers, and his concerns were about himself and not the victims. Keener's testimony can also be viewed as relevant to his credibility. In other words,

although his relationship to McAlpin caused him to fear for the safety of his own family, he nevertheless was willing to testify against McAlpin at trial.

### 5. *The challenged testimony did not prejudice McAlpin*

{¶ 129} Although some of the challenged testimony was inadmissible victim-impact evidence, McAlpin has not demonstrated that his substantial rights were affected by the introduction of any of the challenged testimony. In view of the overwhelming evidence of his guilt as established by DNA and forensic evidence, surveillance video, and other testimony, we find that the challenged evidence did not have an impact on the jury's guilty verdict. And although this court has recognized that there may be instances when the introduction of inadmissible evidence during the trial phase of a capital proceeding carries over and affects the fairness of proceedings during the mitigation phase, *see State v. Thompson*, 33 Ohio St.3d 1, 15, 514 N.E.2d 407 (1987), we are not concerned that this happened here. When considering a question of carry-over effect, the "type and magnitude of any error" guides our analysis. *See id*. In this case, McAlpin did not object to the error. Furthermore, the magnitude of the error was greatly diminished by the trial court's instructions to the jury. Specifically, during the mitigation phase the trial court instructed the jury:

> It is your sworn duty to accept these instructions, to apply the law as it is given to you.
>
> You are not permitted to change the law, or to apply your own idea of what you think the law should be.
>
> * * *
>
> * * * Only the aggravating circumstances related to a given count may be considered and weighed against the mitigating factors in determining the penalty for that count.
>
> * * *

For purposes of this proceeding, only that evidence admitted into the trial phase—admitted in the trial phase that is relevant to the aggravating circumstances and to any of the mitigating factors is to be considered by you.

You will also consider all of the evidence admitted during the sentencing phase together with the defendant's own statement.

\* \* \*

When you consider the nature and circumstances of the offense, you may consider them only if they have mitigating value.

You may not consider the nature and circumstances of the crime as an aggravating circumstance.

You must not be influenced by any consideration of sympathy or prejudice. It is your duty to carefully weigh the evidence, to decide all disputed questions of fact, to apply the instructions of the Court to your findings and to render your verdict accordingly.

In fulfilling your duty, your efforts must be to arrive at a just verdict. Consider all the evidence and make your finding with intelligence and impartiality and without bias, sympathy or prejudice.

The court had also said:

The aggravating circumstances that I go over for you are the only things that can be weighed on the aggravation side of that scale.

You cannot weigh anything else as a reason to impose the death penalty other than the aggravating circumstances.

The law wants me to emphasize that to you at this point. That is very important.

We find that these jury instructions abated the magnitude of the error by making clear to the jurors that they could not consider the nature and circumstances of the murders unless the nature and circumstances had mitigating value. Thus, we hold that no plain error occurred in the admission of the challenged evidence. *See* Crim.R. 52(B); *State v. McNeill*, 83 Ohio St.3d 438, 445-446, 700 N.E.2d 596 (1998).

{¶ 130} Therefore, we reject McAlpin's sixth proposition of law. We nevertheless reiterate that victim-impact testimony must be evaluated under the Rules of Evidence and it is not admissible in a trial unless it is relevant to the commission of the offense. *See Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, 172 N.E.3d 841, at ¶ 136. And even when the evidence is relevant, it still must be excluded when its "probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A). Although we find no basis for reversing in this case, we urge the state to refrain from eliciting this type of irrelevant evidence in the first place. Additionally, and more importantly, when the evidence is found to be relevant, we remind trial courts to weigh the probative value of such evidence against the risk it poses of "inflaming the passions of the jury," *Thompson*, 33 Ohio St.3d at 15, 514 N.E.2d 407.

### F. Introduction of unfairly prejudicial evidence

{¶ 131} In his seventh proposition of law, McAlpin argues that he was denied a fair trial and a reliable hearing because the trial court admitted an unredacted exhibit containing his Google search history, which included searches for pornography and strip clubs. He also contends that the trial court erred when it readmitted the exhibit during mitigation.

{¶ 132} Jacob Kunkle, an FBI special agent trained in cellular-data analysis, testified that he reviewed and analyzed 56 pages of search history for the Google account associated with what appeared to be McAlpin's email address. The search history includes hundreds of entries over a ten-week period from April 1 to June 13, 2017. It contains both search inquiries and visits to certain websites, including searches for information such as directions to certain locations, nearby restaurants, and nearby pawn shops and salvage yards and how to do things like "properly hook subwoofers up to a 1 channel amplifier" or tune-up certain automobiles. The exhibit also contains searches for automobile parts, videos on youtube.com, Yahoo mail, and sites such as Instagram, Facebook, Pinterest, and eBay.

{¶ 133} The exhibit also shows that McAlpin searched for and/or visited the pornography website www.xnxx.com approximately ten times over ten weeks. He also searched for another adults-only website, "nightline chat," "gentlemen's club," "strip clubs near me," "exotic dancers near me," and "4play lounge Euclid."

{¶ 134} On April 14, 2017, before the murders, McAlpin searched for "easy way to break a window," "salvage yard near me," and "pull apart near me." On April 15, shortly after the murders, McAlpin's Google account logged searches for, among other things, "all 2008 Salvage BMW for sale," "2008 BMW 521 four door," and "can you switch a title into your name without the other parties permission." And McAlpin's account shows a search on April 22 for "latest news on the stolen bmw from car lot murder" and a visit to www.cleveland19.com to view an article titled "cars stolen after dealership owners murdered." McAlpin's search history shows more searches for news and information about the murders on April 27 and May 9, 2017.

{¶ 135} The exhibit containing McAlpin's Google search history was admitted after the state rested their case during the trial phase, over McAlpin's objection. McAlpin did not object when the state introduced the document during

Special Agent Kunkle's testimony or when the trial court readmitted it for the mitigation phase.

{¶ 136} Evidence must be relevant to be admissible, meaning that the evidence must have a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Relevant evidence is generally admissible, Evid.R. 402, unless "its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury," Evid.R. 403(A). A trial court may exclude relevant evidence if "its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence." Evid.R. 403(B).

### 1. Trial phase

{¶ 137} McAlpin argues that specific pages of exhibit No. 1433 contain "unfairly prejudicial, irrelevant, and inflammatory information." He contends that "[t]he evidence of his guilt was not overwhelming, and the danger too great [that] the jury considered this prejudicial information during its deliberations."

{¶ 138} Before we address prejudice, we must determine whether the Google exhibit is relevant. McAlpin does not dispute that the exhibit contained relevant and admissible information. Indeed, Special Agent Kunkle prepared a report that specifically identifies the relevant searches contained in the exhibit. He testified that McAlpin's Google account was used on April 5, 2017, to search for information about firearms and to compare different calibers of firearms. He additionally testified about McAlpin's April 14 and 15 searches about how to salvage a stolen vehicle and McAlpin's April 22, April 27, and May 9 searches for the latest news on the car lot murders.

{¶ 139} These Google searches constituted relevant, circumstantial evidence of McAlpin's intent to steal cars and resell them and, more specifically, of his intent to use a firearm during the robbery. *See State v. Sutherland*, 2021-

Ohio-2433, 173 N.E.3d 942, ¶ 21, 27 (2d Dist.) (holding that Google searches were probative and relevant circumstantial evidence of guilt).

{¶ 140} But the Google exhibit also contains many searches and other internet activity that bear no relation to the murders or to the other crimes with which McAlpin was charged. Nevertheless, the handful of references to irrelevant, explicit, or pornographic websites were not mentioned during Special Agent Kunkle's testimony and were unlikely to influence the jury. In light of the overwhelming evidence of McAlpin's guilt, we are not convinced that the jury's decision to convict him was affected by evidence that he viewed or searched for pornographic or adults-only websites.

### 2. Mitigation phase

{¶ 141} Because McAlpin failed to object to the readmission of exhibit No. 1433 during the mitigation phase, we are again limited to plain-error review. *State v. Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, ¶ 132.

{¶ 142} R.C. 2929.03(D)(1) "provides in part that during the penalty stage, the court and the trial jury *shall* consider '* * * any evidence raised at trial that is relevant to the aggravating circumstances the offender was found guilty of committing' * * * [and] 'shall hear testimony and other evidence that is relevant to *the nature and circumstances* of the aggravating circumstances the offender was found guilty of committing.' " (Emphasis sic.) *State v. DePew*, 38 Ohio St.3d 275, 282-283, 528 N.E.2d 542 (1988), quoting R.C. 2929.03(D)(1). In *DePew*, we also observed that not only is repetition of trial-phase evidence for the mitigation hearing required by the statute but it is also logical given "the prosecution's obligation to demonstrate, by proof beyond a reasonable doubt, that the aggravating circumstances the defendant was found guilty of committing are sufficient to outweigh the factors in mitigation." *Id*. at 283.

{¶ 143} Although exhibit No. 1433 does contain many irrelevant internet searches connected to McAlpin's Google account, the majority of the irrelevant

material was noninflammatory, with the potential exception of the few adult-related searches described above. Furthermore, the searches that were relevant had high probative value because they supported the capital specification that McAlpin committed the murder during the course of an aggravated robbery as the principal offender. Several of the searches were also probative of McAlpin's identity as the murderer.

**{¶ 144}** We thus conclude that McAlpin cannot establish plain error with respect to the readmission of exhibit No. 1433 during the mitigation phase. Therefore, we reject McAlpin's seventh proposition of law.

### G. Confrontation Clause violation

**{¶ 145}** In proposition of law No. VIII, McAlpin contends that the trial court improperly restricted his cross-examination of FBI Special Agent Brian Young. McAlpin says that he was "precluded * * * from present[ing] the jury with a reasonable explanation as to why his cell phone was pinging of[f] an area cell tower" and thereby was deprived of "his ability to examine the state witness as to a material component of the state's case."

**{¶ 146}** Special Agent Young testified about the forensic cellular-phone analysis that he conducted for this case. During their investigation, Young and Detective Echols requested a "cell tower dump," which provides information for any cell phone using a specific cell tower at a particular time and in a particular area. The cell-tower dump was requested for April 14, 2017, from about 5:15 to 7:00 p.m. in the area of Mr. Cars.

**{¶ 147}** Special Agent Young testified that McAlpin's number called Mr. Cars at 4:09 p.m. and called Keener's number 13 minutes later. The records also showed 13 additional calls between McAlpin's and Keener's phones before 6:47 p.m. The last call occurred a couple of minutes before the vehicles were driven off the Mr. Cars lot.

**{¶ 148}** According to Young, McAlpin's and Keener's phones used the same cell tower from approximately 5:15 to 6:45 p.m. The tower was located just a little bit northeast of Mr. Cars, off East 185th Street.

**{¶ 149}** On cross-examination, Young agreed that there is no way to know from records who is using a cell phone when calls are made. Young also stated that when a cell phone pings off a particular tower, the person using that phone is not necessarily at the tower's location. But it does mean that a person using that phone is "within th[e] radius that that tower covers."

**{¶ 150}** McAlpin then asked Special Agent Young whether he knew that McAlpin lived in the area of East 185th Street. The trial court sustained the state's objection to this question. McAlpin started to ask again whether Young was "aware that Joseph McAlpin stayed in the vicinity," but before Young answered, the trial court sustained the state's second objection.

**{¶ 151}** A defendant's right to cross-examine the state's witnesses is guaranteed by both the Confrontation Clause of the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution. *Douglas v. Alabama*, 380 U.S. 415, 418, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965); *State v. Self*, 56 Ohio St.3d 73, 78, 564 N.E.2d 446 (1990). The Sixth Amendment's Confrontation Clause precludes a trial court from placing "improper restrictions" on defense cross-examination. *Pennsylvania v. Ritchie*, 480 U.S. 39, 52, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987). However, the Confrontation Clause "guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (Emphasis sic.) *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985). A trial court is free to "impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674

(1986). The scope of cross-examination lies within the sound discretion of the trial court, viewed in relation to the particular facts of the case. *State v. Slagle*, 65 Ohio St.3d 597, 605, 605 N.E.2d 916 (1992).

{¶ 152} McAlpin's argument that he was denied his right to confront Special Agent Young is unpersuasive. To establish a Confrontation Clause violation, McAlpin must show that he was "prohibited from engaging in otherwise appropriate cross-examination." *Van Arsdall* at 680.

{¶ 153} On cross-examination, McAlpin sought to have Young testify that the call-detail records and cell-tower information were consistent with McAlpin's being at home on the night of the murders. He asked, "Were you aware that Joseph McAlpin lived * * * within a quarter mile of the closest tower [to Mr. Cars]?" The record does not explain why the state objected or why the court sustained the objection. However, the court may have sustained it for lack of foundation as McAlpin had not established that Young knew where he lived or had been involved in the search of his home. Additionally, the form of the question could be viewed as an improper attempt by McAlpin to provide his own testimony to the jury regarding where he lived.

{¶ 154} Because legitimate, legally supportable reasons exist for sustaining the state's objection, McAlpin has not demonstrated that the trial court erred. Therefore, we reject this proposition of law.

### H. Prosecutorial misconduct in trial phase

{¶ 155} In proposition of law No. IX, McAlpin argues that prosecutorial misconduct during the trial-phase closing arguments denied him a fair trial.

{¶ 156} We review allegations of prosecutorial misconduct during closing arguments by asking "whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant." *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). Although "criminal trials cannot be squeezed dry of all feeling," *State v. Keenan*, 66 Ohio St.3d 402, 409, 613 N.E.2d 203 (1993),

"excessively emotional arguments tending to inflame the jury's sensibilities" are improper, *State v. Tibbetts*, 92 Ohio St.3d 146, 168, 749 N.E.2d 226 (2001). However, "[t]he touchstone of the analysis 'is the fairness of the trial, not the culpability of the prosecutor.' " *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 155, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

{¶ 157} McAlpin failed to object to the various aspects of the prosecution's closing arguments and has therefore forfeited all but plain-error review of his claims. *See Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, at ¶ 21.

### 1. *"Victim character" evidence*

{¶ 158} McAlpin first focuses on the prosecutor's evocation of Martin's testimony that included improper victim-impact and character-evidence testimony. Much of Martin's testimony concerned the good character of Trina and Michael, their hardworking nature, how they cared for him and encouraged him to get back into rehab, and how close Martin felt to Michael and Trina.

{¶ 159} During closing argument, the prosecutor referred to Martin's testimony as follows:

> 5:03 p.m., Albert. You can say what you want about Albert. Albert lost two people that he loved dearly. Albert has his own problems. Albert's not a killer. That's why Albert was in here. You got to see Albert. Brought a bone for Axel the next day and left it at the front. You can evaluate Albert.

McAlpin did not object to these comments and has forfeited this claim absent plain error. *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, 776 N.E.2d 26, ¶ 24.

{¶ 160} McAlpin maintains that these comments were repeated by the prosecution "once again to evoke emotion from the jury." The state contends that

the statements were proper because Martin's testimony was relevant to proving that Martin did not commit the crimes. But as explained above, much of Martin's testimony was not relevant to the state's alleged purpose of eliminating Martin as a suspect. Even so, the prosecutor's comments repeating Martin's improper testimony were isolated remarks limited to whether Martin should be considered a suspect, and they were not flagrantly emotional or intended to mislead the jury. *See Tibbetts*, 92 Ohio St.3d at 168, 749 N.E.2d 226.

{¶ 161} Accordingly, no plain error occurred with respect to the prosecutor's commentary on Martin's testimony.

### 2. Alleged emotionally charged argument

#### a. Why the daughter was not called as a witness

{¶ 162} McAlpin contends that the prosecutor's rhetoric during closing arguments "improperly aligned the state with the role of a parent, appealing to the paternalistic instinct of the jurors and calling on them to protect and sympathize with" the victims' teenage daughter.

{¶ 163} During closing argument, the prosecutor referred to the state's decision not to call the daughter as a witness at trial. The state also brought up Bonnes's testimony "that [the daughter] told [Bonnes] that she heard Albert in the background" the last time she spoke to Trina. Later, the prosecutor repeated that at "5:28 [p.m.], with the defendant already in [Mr. Cars], [a] 13-year-old girl talks to her parents for the last time, not knowing that it was going to be the last time." The prosecutor continued:

> Sometimes you have to make a decision as a professional, as a human being, as a father, on what you're going to put a child through. I'm not putting that child through this.
>
> We allowed the evidence of what time [the daughter] thinks she talked to her parents to come in because it was the right thing to

do, because that's what the facts as she believed them to be were. We presented it to you. Put on witnesses that had no business testifying about what she said. But we put it on because it was the right thing to do.

It wasn't the right thing to do to traipse her into this courtroom and have her face the man that's accused of killing her parents. If you want to hold that against somebody, hold it against me. But I wasn't going to do it.

She believed that she talked to her parents at 7:00. Well, folks, there's no calls at 7:00. She believed that Albert was there the last time she talked to her parents. The calls at 8:30, folks, are five seconds and seven seconds, and they're back to back.

Use your reason, use your common sense, and you tell me why a kid is calling her parents back to back. Because they're not answering the phone.

* * *

It's not just the records, folks. It's not just the fact that we know that the things that a 13-year-old child who just found out that her mother and father were executed and the things that she's going to remember in the haze and everything else. It's what the evidence shows.

Because if you believe that she talked to her parents at 8:30, you also believe that her parents allowed two individuals to come take a BMW and a Mercedes without anything else, without paying for them, without leaving anything. By the way, without ever coming back.

{¶ 164} McAlpin had cross-examined witnesses regarding the time that the daughter last spoke to her parents. Accordingly, we conclude that it was not improper for the prosecutor to refer to Bonnes's testimony that the daughter said that she heard Martin in the background during the telephone call.

{¶ 165} However, the prosecutor's comments concerning why he was unwilling to place the daughter on the witness stand were improper. Equating the state's decision whether to call the daughter as a witness with a moral judgment was improper to the extent that it played on the jury's sympathies by implying that the prosecutor had made the decision not to subpoena her from the perspective of a parent. *See State v. Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, ¶ 87.

{¶ 166} During its rebuttal argument, the prosecutor returned to the issue of the daughter's absent testimony by noting:

> And he wants to tell you in the next breath you should have wanted to hear from [her], this 13-year-old daughter who lost her parents tragically, drastically, horrifically at his hands.
>
> Yet, we're supposed to put her on the stand? Absolutely not. Not only does [my co-counsel] take responsibility for it, so do I. I am not putting a little girl through that. For her to be questioned by him? That's unimaginable, ladies and gentlemen.
>
> * * *
>
> Because she kept getting a voicemail, wondering, Mommy, where are you all? It's Good Friday. I'm hungry. You told me that you would bring me a fish dinner home for me and my brother * * *.

{¶ 167} Because the daughter did not testify, there was no basis for the prosecutor's insinuation that he knew what she was thinking on April 14, 2017. His

suggestion that on April 14 the daughter was wondering where her parents were and was hungry because they had not brought her food improperly appealed to the jurors' emotions and sympathy.

{¶ 168} However, "[a]n improper comment does not affect a substantial right of the accused if it is clear beyond a reasonable doubt that the jury would have found the defendant guilty even without the improper comments." *State v. Treesh*, 90 Ohio St.3d 460, 464, 739 N.E.2d 749 (2001). The evidence of McAlpin's guilt was substantial. And while some of the prosecutor's arguments were excessively emotional and not based on the evidence, "[t]he conduct of a prosecuting attorney during trial cannot be made a ground of error unless the conduct deprives [the] defendant of a fair trial." *State v. Apanovitch*, 33 Ohio St.3d 19, 24, 514 N.E.2d 394 (1987). Thus, this claim lacks merit.

*b. Asking jurors to consider what victims experienced*

{¶ 169} McAlpin also argues that the prosecutor improperly aroused "fear in the jury, [by] asking the jury to consider what the victims experienced and felt in their final moments."

{¶ 170} First, McAlpin claims that the prosecutor improperly argued that he "was just thinking about [Michael and Trina's] final moments and what fear, what could it be, whether it was Michael first or Trina first. Not only fear for yourself, but the absolute devastation of knowing that your loved one, your partner, is dead."

{¶ 171} We have "said that it is improper for prosecutors to comment on what the victim was thinking when he or she died, as it 'invites the jury to speculate on facts not in evidence.' " *State v. Kirkland*, 160 Ohio St.3d 389, 2020-Ohio-4079, 157 N.E.3d 716, ¶ 116, quoting *State v. Wogenstahl*, 75 Ohio St.3d 344, 357, 662 N.E.2d 311 (1996). The prosecutor's argument here was improper because there was no evidence of what the victims were thinking at or before the time of their deaths.

**{¶ 172}** Second, McAlpin asserts that the prosecutor used graphic imagery to improperly speculate about what Zaczkowski felt when he discovered Michael's body. Referring to one of the surveillance videos, the prosecutor commented that "the video tells some of the story, but it doesn't describe [Zaczkowski's] pain. * * * In what condition was he in discovering his mother on the floor with a gunshot wound to her head. What he thought was his mother was actually Michael." This comment invited the jury to imagine what Zaczkowski felt upon entering Mr. Cars, which is both irrelevant and improper because there was no evidence about what Zaczkowski was thinking or feeling that night. The prosecutor also improperly suggested that Zaczkowski saw his mother's body when he went inside the building, before reminding the jury that it was actually Michael's. This type of tactic is improper because "[a] closing argument that goes beyond the record in order to arouse an emotional response in the jury may be prejudicial." *Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, at ¶ 87.

### c. Arguing facts not in evidence

**{¶ 173}** McAlpin contends that, compounding the error, the prosecutor "improperly intimated to the jurors that McAlpin posed a threat to Keener's entire family, a fact not in evidence." The prosecutor returned to fear again when arguing why Keener's testimony was believable:

> You want to believe that [Keener] was afraid? You want to know what he was afraid of, the pictures I showed him? He was afraid of this. He was afraid of what happened to the two people that were inside Mr. Cars.
>
> This is what he was afraid of. Because when he saw these pictures, he didn't see Michael and Trina. He saw his mother and his brothers and his sisters and his nieces and his nephews. You want to know what fear is like? Think of that.

This was not an improper comment, because the prosecutor was not implying that McAlpin had threatened anyone. Rather, the reference to Keener's family reflected what could be drawn from Keener's testimony: that Keener was afraid of McAlpin because of what McAlpin had done to Trina and Michael.

{¶ 174} McAlpin also argues that the prosecutor "interjected his own perspective," editorialized, and mixed evidence with opinion. In support, McAlpin points to the following statement made during the state's closing argument:

> 6:31, that's the end of that timeframe, folks, where we don't see any action. We don't see anything. Until we see somebody calmly and coolly, not rushed, taking his time, walking up to a BMW and putting license plates on the back of that car. Like he belongs there.
>
> Like there's nothing to worry about. Knowing that two people had gunshot wounds to their head in the building right behind him. No cares in the world. Not worried that he's going to get caught.

The state was describing a portion of the surveillance video in which no person is seen entering or leaving the building between 5:24 p.m. and 6:31 p.m. This was not improper. The surveillance videos show that a person walked to the BMW and put a license plate on it. The prosecutor was entitled to make a fair comment and suggest a reasonable inference from the evidence.

### 3. Commenting on McAlpin's decision not to testify

{¶ 175} McAlpin further maintains that the prosecutor's trial-phase rebuttal closing argument improperly commented on McAlpin's decision not to testify as follows: "I guess when he's testifying and he's cross-examining, he might as well

have been testifying * * *." The state contends that in the context of the whole trial, this was not an improper comment on McAlpin's decision not to testify.

{¶ 176} In context, this statement was not improper; by making this argument the state was pointing out that McAlpin had attempted to get his version of events in front of the jury without testifying, through the use of leading questions on cross-examination. This was a proper comment for the state's closing argument. We have cautioned that "isolated comments by a prosecutor are not to be taken out of context and given their most damaging meaning." *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 94, citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 647, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974) ("a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations"). It was fair for the state to argue that McAlpin was trying to testify directly to the jury under the guise of cross-examination. This did not violate McAlpin's Fifth Amendment rights, so we reject this claim.

### 4. Denigrating comments

{¶ 177} McAlpin challenges other arguments by the prosecutor as mocking him and denigrating the defense. He specifically challenges eight comments by the prosecutor.

{¶ 178} For example, McAlpin contends that the prosecutor was disparaging the defense when, during trial-phase closing arguments, the prosecutor questioned whether McAlpin's defense was "reasonable." Specifically, the prosecutor argued:

> Is it reasonable to expect that [McAlpin's] DNA flew all over the
> place, that it transferred from spot to spot? It just happened to be in
> a spot where two people were executed? It happened to be next to

56

the head of a woman that was killed, in the back pockets of a dead man, into a car that was stolen?

It's not a reasonable expectation. It's not likely. It's ridiculous. Because not only is it ridiculous to believe that. You would have to put aside all the other evidence that points to him.

**{¶ 179}** McAlpin also challenges the following argument made during the state's trial-phase rebuttal:

[A]nd he's cross-examining Laura Evans. He said isn't it possible if I gave this card to [standby counsel] and he puts it in his pocket and your DNA could be in there? Really?

It's possible that I may wake up tomorrow and have a physical or medical miracle and all of a sudden, I'm 6'4". Really? Really? Who all believes that?

At almost 50 years old, overnight. Anything is possible. That's what I heard from him. Anything is possible. * * * That defies logic. It defies reason and it absolutely defies your common sense.

**{¶ 180}** "Prosecutors are entitled to latitude as to what the evidence has shown and what inferences can be drawn from the evidence." *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 213. In these comments, the prosecutor was anticipating McAlpin's closing argument that his DNA could have been transferred secondarily to objects inside Mr. Cars, like the modem. Because McAlpin raised the issue of secondary DNA transfer during trial, it was not improper for the prosecutor to comment on it during closing. Prosecutors are entitled to state their opinion during closing arguments, as long as it is based on the

evidence at trial. *State v. Jackson*, 107 Ohio St.3d 300, 2006-Ohio-1, 839 N.E.2d 362, ¶ 154.

{¶ 181} Despite McAlpin's argument, the prosecutor's statement during closing—"You're all smarter than that, folks. It's not reasonable. It's not likely. It's all fraudulent"—was also not improper. The prosecutor's statement represented fair commentary on McAlpin's unsupported, secondary-transfer defense during the trial. Moreover, even if the statement had been improper, the strength of the state's evidence showing that McAlpin planned and executed the Mr. Cars robbery and murders eviscerates any notion that there could have been a demonstrable prejudicial effect on the jurors.

{¶ 182} The prosecutor's use of the word "fraudulent" insinuated that McAlpin's defense was dishonest. While it is improper for a prosecutor to suggest that the defense has "fashion[ed] lies to be presented in court," *Smith*, 14 Ohio St.3d at 14, 470 N.E.2d 883, these comments were primarily directed at the evidence and not at McAlpin. No plain error occurred. *See Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, at ¶ 221.

{¶ 183} In rebuttal, the prosecutor made the following comments:

When you look at that flag, nobody has to tell you how many stripes are on that flag, or how many stars exist.

He can come in here and tell you that's not the American flag. That's just a replica. But would that be based on your reason and common sense, * * * and you believe that nonsense that that flag is something else other than the United States flag?

This is what he's trying to sell to all of you. Well, justice is not for sale, ladies and gentlemen. * * *

* * * Lies, lies, lies he tell [sic] you about Keener. * * *
* * *

58

And he wants to argue about testing the inside pockets as if he's an expert. As if he works at the crime lab.

You see, ladies and gentlemen, what I've learned in examining this evidence, and hopefully you did, too, that some people think they [are] smarter than everybody.

Some people think that they can tell anybody anything they want. And all they've got to do is get one or two people to believe them, and that's it.

{¶ 184} These comments were not improper because they rebutted McAlpin's closing, during which he insisted that he was innocent, that Keener was a liar, that the state's evidence was "nothing but typed up notations," and that the state's witnesses contradicted themselves.

{¶ 185} The prosecutor was entitled to respond to McAlpin's closing argument by suggesting that McAlpin had asked the jurors to believe something that they knew was untrue. Moreover, McAlpin had argued, "I have not deceived not one time outside of my opening statement. * * * I've been honest. I've been open, and I have hid nothing at all." Thus, McAlpin injected the issue of his honesty into the case and the prosecutor was entitled to respond by pointing out that the jury did not have to believe his unsupported assertions.

{¶ 186} McAlpin maintains that the prosecutor's argument—"And he wants to tell you in the next breath you should have wanted to hear from * * * this 13-year-old daughter who lost her parents tragically, drastically, horrifically at his hands"—improperly appealed to the jury's emotions. This comment was in response to McAlpin's argument that the state was hiding something by not calling the daughter as a witness. Because we have held that "both parties are entitled to wide latitude during closing arguments," this was within the permissible scope of closing argument. *State v. White*, 82 Ohio St.3d 16, 23, 693 N.E.2d 772 (1998).

Moreover, we have held that "a prosecutor may denounce the defendant's wrongdoing." *State v. Keene*, 81 Ohio St.3d 646, 666, 693 N.E.2d 246 (1998).

### 5. Cumulative misconduct

{¶ 187} McAlpin asks this court to cumulate all of the alleged misconduct and find that, as a whole, it "so infected the trial with unfairness as to make the resulting conviction a denial of due process," *Donnelly*, 416 U.S. at 643, 94 S.Ct. 1868, 40 L.Ed.2d 431; *see also Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).

{¶ 188} McAlpin was not deprived of a fair trial due to prosecutorial misconduct. The evidence against McAlpin was overwhelming, and there is little chance that absent the improper comments, the result of his trial would have been different. And any potential prejudice was mitigated by the trial court's instruction to the jury that closing arguments are not evidence. *State v. Jones*, 91 Ohio St.3d at 353, 744 N.E.2d 1163. Therefore, we reject McAlpin's ninth proposition of law.

## I. Merger of aggravating circumstances

{¶ 189} In his tenth proposition of law, McAlpin contends that the trial court erroneously failed to merge the capital specifications found by the jury. The state responds that there was a separate animus for each of the three capital specifications the jury considered during sentencing. Because McAlpin did not raise this objection at trial, he cannot prevail on this claim absent a finding of plain error. Crim.R. 52(B); *Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, at ¶ 21.

{¶ 190} The jury convicted McAlpin of all counts and specifications in the indictment. Counts 1 through 4 charged McAlpin with aggravated murder. The state elected to proceed to sentencing on Counts 1 and 2, so the court merged Counts 3 and 4 with the first two counts. Counts 1 and 2 each carried three capital

specifications:[2] (1) a course of conduct involving the purposeful killing of two or more individuals, R.C. 2929.04(A)(5), (2) the commission of aggravated murder during the commission of an aggravated burglary, R.C. 2929.04(A)(7), and (3) the commission of aggravated murder during the commission of an aggravated robbery, R.C. 2929.04(A)(7).

{¶ 191} McAlpin contends that both felony-murder specifications should have been merged with the course-of-conduct specification for purposes of the trial court's sentencing findings. Merger of capital specifications is required "where two or more aggravating circumstances arise from the same act or indivisible course of conduct." *State v. Jenkins*, 15 Ohio St.3d 164, 473 N.E.2d 264 (1984), paragraph five of the syllabus. However, we have "repeatedly held that 'specifications for multiple-murder and for felony-murder represent distinct and separate aggravating circumstances,' " are "not duplicative," and "do not merge." *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 175, quoting *Smith*, 80 Ohio St.3d at 116, 684 N.E.2d 668.

{¶ 192} Yet McAlpin argues that the felony-murder and course-of-conduct specifications should be merged if the defendant's "motive and intent [are] the same for both acts." He cites *Tibbetts*, 92 Ohio St.3d at 171-172, 749 N.E.2d 226, in support of his argument.

{¶ 193} However, *Tibbetts* does not state, as McAlpin suggests, that irrespective of the prior precedent, the specifications under R.C. 2929.04(A)(5) and (A)(7) should be merged when the defendant's motive and intent are the same for both acts. We conclude that the course-of-conduct specification is not subject to merger with the felony-murder specifications for aggravated burglary and aggravated robbery.

---

2. The fourth capital specification for committing aggravated murder while under detention was dismissed by the state on March 5, 2019.

{¶ 194} McAlpin argues, in the alternative, that the trial court should have merged the two felony-murder specifications. To determine whether the aggravated-burglary and aggravated-robbery aggravating circumstances were a single act requiring merger, we apply a three-part test. *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 31; *State v. Jackson*, 149 Ohio St.3d 55, 2016-Ohio-5488, 73 N.E.3d 414, ¶ 128-129 (applying *Ruff* test to merger of aggravating circumstances). An affirmative answer to any of the following three questions makes merger needless: "(1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation?" *Ruff* at ¶ 31.

{¶ 195} We recently considered whether felony-murder aggravating circumstances for aggravated robbery and aggravated burglary should have been merged for sentencing. *See Jackson* at ¶ 128-129. Jackson was convicted of two counts of aggravated murder, each with two capital specifications: murder during an aggravated burglary and murder during an aggravated robbery. On appeal, Jackson argued that the felony-murder aggravating circumstances should have been merged. Applying *Ruff*, we held that the specifications were not subject to merger, because "[t]he burglary was complete when Jackson entered [the victim's] residence with the intent to commit murder, theft, or kidnapping * * * [and] Jackson committed aggravated robbery when he stole [the victim's] car after murdering him." *Id*. at ¶ 129.

{¶ 196} Contrary to McAlpin's argument, the same result is required here. The evidence demonstrates that McAlpin committed the aggravated burglary and aggravated robbery with separate animuses. When McAlpin entered Mr. Cars with the intent to commit murder, theft, or kidnapping, the aggravated burglary was complete. He completed the aggravated robbery when he stole the cars and cash after the murders. *See State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶ 128.

{¶ 197} Accordingly, we reject McAlpin's tenth proposition of law.

### J. Readmission of exhibits during mitigation

{¶ 198} In support of his eleventh proposition of law, McAlpin contends that it was prejudicial error to admit certain trial-phase evidence during the mitigation phase. McAlpin did not raise this objection at trial, so he has forfeited this claim absent plain error. Crim.R. 52(B); *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002).

{¶ 199} McAlpin contends that the following categories of exhibits should not have been readmitted: crime-scene photos, autopsy photos and reports, photos of Trina in a body bag, photos of the victims' clothing, trace-evidence reports, bullet fragments, bullet-fragment photos and lab reports, body-cam videos, and the recording of the 9-1-1 call. McAlpin also contends that exhibit No. 1433, which contained the searches and sites visited as logged by McAlpin's Google account, was irrelevant and highly prejudicial.

{¶ 200} Citing our decision in *Ketterer*, the state contends that it is not per se error for the trial court to readmit all of the trial-phase evidence. *See* 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, at ¶ 132-133. However, *Ketterer* does not have the broad meaning that the state suggests. Ketterer tried his aggravated-murder case to a three-judge panel. That fact was central to our holding that no plain error occurred when the panel allowed the state to reintroduce at the mitigation phase all the trial-phase evidence. *See id.*, quoting *State v. Davis*, 63 Ohio St.3d 44, 48, 584 N.E.2d 1192 (1992) ("A panel of judges is presumed to 'consider only relevant, competent and admissible evidence in its deliberations' ").

{¶ 201} It is the trial court's duty to determine which trial-phase exhibits are relevant to the aggravating circumstances for purposes of the mitigation phase. *State v. Lindsey*, 87 Ohio St.3d 479, 484, 721 N.E.2d 995 (2000). As in McAlpin's case, the trial court in *Lindsey* readmitted all trial-phase evidence for the jury to consider during the mitigation phase. We held that "[w]hile R.C. 2929.03(D)(1)

permits the reintroduction of much or all of the guilt-phase evidence during the penalty phase, it does not relieve the trial court of its duty to determine the evidence relevant for consideration." *Lindsey* at 484. In *Lindsey*, the error arose not when the trial court admitted the trial-phase evidence in toto for the mitigation phase but when the court instructed the jury to consider all the evidence, including exhibits presented in the first phase of the trial, that the jury *deemed relevant*. *Id*. at 485. The court's instruction "improperly delegated to the jury the court's duty to determine the evidence relevant to the penalty phase." *Id*.

{¶ 202} However, we ultimately determined that the readmission of all the trial-phase evidence was not reversible error. We concluded that the evidence did not prejudice the outcome of the trial, because it was "relevant to the aggravated robbery, the aggravating circumstance of which [Lindsey] was found guilty, as [it] demonstrated the element of serious physical harm to the victim." *Id*.

{¶ 203} Unlike in *Lindsey*, there is nothing in the record before us that definitively suggests that the trial court abdicated its duty to determine what trial-phase evidence was relevant to the aggravating circumstances specified in the indictment of which McAlpin was found guilty. The record does not contain a jury instruction similar to the erroneous instruction in *Lindsey* when the trial court impermissibly delegated to the jury the duty to determine what evidence was relevant. Thus, it is possible that when faced with the state's motion to readmit all the exhibits and McAlpin's negative response to the court's question whether he had any objections to the motion, the trial court determined that all of the evidence was relevant and admissible and on that basis granted the motion. Nothing prevents a trial court from readmitting all trial-phase evidence if that evidence is relevant. *See id.* at 484. Accordingly, it cannot be said that the trial court erred simply by readmitting all the evidence for the mitigation phase.

{¶ 204} Shifting our focus to whether the trial court erred in admitting any particular evidence and, if so, whether any error prejudiced McAlpin's substantial

rights, McAlpin posits that the Google-search exhibit (*see* proposition of law No. VII), the medical examiner's exhibits, and the crime-scene photographs were particularly prejudicial. He also asserts that the crime-scene photos of the victims and the dog were inadmissible because of the danger that the jury would "inflate the weight" of the aggravating factors.

{¶ 205} As we explained in our discussion of McAlpin's seventh proposition of law, the Google-search exhibit contained some irrelevant information. However, the parts of the exhibit that were irrelevant were not likely to arouse the jurors' emotions. We find no prejudicial error in the trial court's decision to readmit the Google-search exhibit for the mitigation phase.

{¶ 206} Along with the two autopsy reports, the medical examiner submitted over 60 autopsy photographs in total. These depict the victims' bodies, close-ups of gunshot wounds, close-ups of internal organs, including brain and shoulder areas, other injuries, and the bullet fragments recovered from each victim. These photos were germane to the aggravated-robbery aggravating circumstance because they depict the seriousness of Michael's and Trina's injuries and confirm that a firearm was used in the murders. But some of the photos were cumulative and gruesome, and the trial court should not have readmitted them for the mitigation phase. The trial court also should not have allowed the picture of the dead dog to be readmitted. This photo had no relevance to any of the aggravating circumstances—a fact that should have been obvious to both the prosecution and the trial court. We have recently warned trial courts about allowing the introduction of such evidence:

> [W]e caution trial courts to closely scrutinize the crime-scene and autopsy photos that are offered as exhibits in murder trials. The admission of gruesome photos exposes the jurors to horrific images, and when those photographs go to an element of the offense that is

clearly proven by other evidence, they serve no useful purpose whatsoever. Instead, such exposure only serves to inflame the passions of jurors and risks subjecting them to harm. A few crime-scene photos showing the body along with the coroner's testimony will often suffice.

*State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, ¶ 257. We remind trial courts of their duties to determine which items of trial-phase evidence are germane to the aggravating circumstances, *Lindsey*, 87 Ohio St.3d at 484-485, 721 N.E.2d 995, and to closely scrutinize the admissibility of gruesome photographs and evidence in accordance with our cautionary statement in *Ford*. Similarly, we also urge the state to refrain from attempting to introduce irrelevant or unnecessary, gruesome, or otherwise inflammatory photographs during the trial or mitigation phase of proceedings.

{¶ 207} However, under the circumstances of this case, including the fact that McAlpin failed to object to the readmission of the evidence in the mitigation phase, we do not find reversible error. As explained in our analysis of McAlpin's sixth proposition of law, the trial court explicitly instructed the jury on what it could and could not consider as aggravating circumstances and also instructed the jury that it must not consider the nature and circumstances of the murders unless they were mitigating. We thus find it highly unlikely that the readmission of any of the trial-phase exhibits affected the outcome of McAlpin's sentencing.

{¶ 208} For the foregoing reasons, we reject McAlpin's eleventh proposition of law.

### K. Unfair mitigation hearing

{¶ 209} In support of proposition of law No. XII, McAlpin contends that the trial court made comments to the jury about why the mitigation phase was delayed and identified mitigation evidence that McAlpin did not present. He argues

that the court's comments deprived him of a fair mitigation hearing. McAlpin did not object to the statements and has therefore forfeited this claim absent plain error. Crim.R. 52(B); *Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, at ¶ 21.

### *1. Relevant law*

**{¶ 210}** In presiding over a trial, "the judge must be cognizant of the effect of his comments upon the jury." *State v. Wade*, 53 Ohio St.2d 182, 187, 373 N.E.2d 1244 (1978), *vacated on other grounds*, *Wade v. Ohio*, 438 U.S. 911, 98 S.Ct. 3138, 57 L.Ed.2d 1157 (1978). A judge must remain impartial and refrain from making comments that could influence a jury to the prejudice of the defendant. *State v. Boyd*, 63 Ohio App.3d 790, 794, 580 N.E.2d 443 (8th Dist.1989).

**{¶ 211}** When reviewing a claim that a trial judge made improper remarks that prejudiced the defendant, we apply the following rules:

> (1) The burden of proof is placed upon the defendant to demonstrate prejudice, (2) it is presumed that the trial judge is in the best position to decide when a breach is committed and what corrective measures are called for, (3) the remarks are to be considered in light of the circumstances under which they are made, [with] (4) consideration [] given to their possible effect upon the jury, and (5) to their possible impairment of the effectiveness of counsel.

*Wade* at 188.

### *2. Relevant facts*

**{¶ 212}** On April 18, 2019, between the trial phase and mitigation phase, the trial court referred McAlpin to the probation department for a presentence investigation and to the "court psychiatric clinic * * * in accordance with [the]

provisions of [R.C.] 2947.06(B) reports for the purpose of determining the disposition of a case: psychiatric recommendations regarding disposition."

{¶ 213} On April 22, 2019, the court brought the jury back and said:

Mr. McAlpin has requested the preparation of two reports. A Presentence report as well as a Court Psychiatric evaluation.

And because of the nature of the case, and just the number of reports that are done, we can't have those done in time for this today.

I'd hoped we could, but we could not do that. It was only after I leaned on Dr. Livingston that she moved it up, and the earliest she can get us the report is May the 10th. All right?

So, I've got to impose on your lives again, and I ask you to come back here on May 13th, on Monday. Then we'll hear the mitigation.

{¶ 214} On May 13, 2019, before bringing the jury in, the court spoke to the parties in chambers. McAlpin argued that he had not yet received a "full mitigation report," only an "overview." He also told the court that he needed a continuance because his expert witness, Dr. Rodio, was unavailable to testify. The state confirmed that Dr. Rodio was out of the country, and it offered to stipulate to the authenticity and admissibility of Dr. Rodio's report. But McAlpin repeated that he had received only the "overview" from the psychiatric clinic and that the clinic "says they don't even do" full mitigation reports. McAlpin referred to the April 18, 2019 order several times and insisted that it said he "was to receive a full mitigation report to prepare for the penalty phase of trial." At standby counsel's suggestion, the court went forward with the mitigation hearing to allow McAlpin to present his lay witnesses.

**{¶ 215}** At a break in the proceedings, the court and parties had a discussion outside the jury's presence. The state indicated that it would stipulate to the admissibility and authenticity of Dr. Rodio's report, the children-services records, and the prison records provided by the Department of Rehabilitation and Correction. However, McAlpin did not agree to the stipulations and wanted Dr. Rodio to testify in person. Given McAlpin's position, the court said that the mitigation phase would have to be continued until later in the week.

**{¶ 216}** McAlpin finished presenting his lay witnesses, then gave his unsworn statement. Next, the court addressed the jury:

> Okay. Ladies and gentlemen of the jury, we had kind of a development. The Court Psychiatric Clinic had prepared a mitigation report * * *.
>
> There was an agreement offered that the defendant has rejected, so we're going to bring Dr. Rodio in live.
>
> Now, here's the problem. Dr. Rodio is out of the country as we speak. He is expected to be able to be contacted on Wednesday night.

The court explained that it did not know whether Dr. Rodio would be available on Thursday. The court then said: "We're going to recess this case until Thursday morning. We'll bring him back here. We'll see if we've got Dr. Rodio. * * * And I apologize for that break. I wasn't expecting it but this is what happens sometimes."

**{¶ 217}** On Thursday, May 16, the court brought back the jury and asked McAlpin to call his next witness. McAlpin announced that he was resting. The court replied, "You're serious?" and then dismissed Dr. Rodio.

### 3. Analysis

{¶ 218} McAlpin argues that the trial court improperly informed the jury that he had requested two reports, identified the reports for the jurors, and told the jurors that McAlpin had rejected a stipulation that would have allowed the mitigation phase to proceed. McAlpin contends that these comments prejudiced him because he ultimately decided not to introduce the reports into evidence or to call Dr. Rodio as a witness. He says that prejudice is evident because, in the midst of its deliberations, the jury requested the reports, which the court refused. McAlpin contends that this allowed the jury to speculate on why he had not introduced the reports.

{¶ 219} The state invokes the doctrine of invited error and alternatively argues that the court's statements were harmless error.

### a. Invited error

{¶ 220} The doctrine of invited error provides that "[a] party will not be permitted to take advantage of an error which he himself invited or induced the trial court to make." *Lester v. Luck*, 142 Ohio St. 91, 50 N.E.2d 145 (1943), paragraph one of the syllabus. But "mere 'acquiescence in the trial judge's erroneous conclusion' " will not support a finding of invited error. *State v. Campbell*, 90 Ohio St.3d 320, 324, 738 N.E.2d 1178 (2000), quoting *Carrothers v. Hunter*, 23 Ohio St.2d 99, 103, 262 N.E.2d 867 (1970). In order for the doctrine to apply, McAlpin must have been " 'actively responsible' for the trial court's error." *Id*., quoting *State v. Kollar*, 93 Ohio St. 89, 91, 112 N.E. 196 (1915).

{¶ 221} McAlpin was not actively responsible for the trial court's statements. The court decided to tell the jury that the delay in the mitigation phase was caused by McAlpin's requests for a presentence investigation and mental examination. The court acted alone in divulging that McAlpin had asked for the reports, that he had rejected the state's offer to stipulate, and that a mitigation report had been prepared. Thus, the invited-error doctrine does not apply.

*b. The propriety of the trial court's comments*

**{¶ 222}** The comments McAlpin objects to were all made to the jury. The trial court's April 22 comments impart that McAlpin's requests caused the first delay. The May 13 comments informed the jury that a mitigation report had been prepared, that McAlpin had rejected an offered stipulation (which meant that an expert would have to testify), that the expert was currently unavailable, and that the trial judge was sorry for the unexpected delay.

**{¶ 223}** The trial court's comments—especially those informing the jury that McAlpin had exercised a statutory right to reports and telling the jury that the report had been prepared—were unnecessary and improper. By telling the jury that a mitigation report McAlpin requested had, in fact, been prepared, the court left the jury to speculate about the contents of the report. Indeed, the jury sent a question to the court during its penalty deliberations asking whether it had "access to the report the defense requested." In response to the jury's question, the court asked McAlpin how he would like the court to respond to the jury's question. McAlpin and the court discussed the possibilities, and then the court instructed the jury: "You have all the reports that have been admitted into evidence."

**{¶ 224}** A trial judge must bear in mind that his or her influence "on the jury is necessarily and properly of great weight." *Starr v. United States*, 153 U.S. 614, 626, 14 S.Ct. 919, 38 L.Ed. 841 (1894). In this instance, the trial court should not have informed the jury that the defense had requested a report. The court could have told the jurors simply that the mitigation phase needed to be delayed until a later date, without telling them why.

**{¶ 225}** Nonetheless, McAlpin has not established plain error. His contention that the trial court's comments put a " 'thumb' on the aggravation side of the weighing process" is unpersuasive. First, the court instructed the jurors during the mitigation phase:

You must not be influenced by any consideration of sympathy or prejudice. It is your duty to carefully weigh the evidence, to decide all disputed questions of fact, to apply the instructions of the Court to your findings and to render your verdict accordingly.

In fulfilling your duty, your efforts must be to arrive at a just verdict. Consider all the evidence and make your finding with intelligence and impartiality and without bias, sympathy or prejudice.

If during the course of the trial, the Court said or did anything you consider an indication of the Court's view on the facts, you are instructed to disregard it.

{¶ 226} We presume that the jury followed the trial court's instructions, *State v. Garner*, 74 Ohio St.3d 49, 59, 656 N.E.2d 623 (1995), and McAlpin has not cited evidence to rebut that presumption. The trial court's comments did not constitute plain error. We reject proposition of law No. XII.

### L. Prosecutorial misconduct during mitigation

{¶ 227} McAlpin asserts, as proposition of law No. XIII, that the prosecutors committed misconduct throughout their mitigation-phase closing argument. He contends that they (1) improperly argued that the nature and circumstances of the offenses were aggravating, (2) improperly commented on McAlpin's unsworn statement, and (3) disparaged the defense. He also argues that the cumulative effect of the alleged prosecutorial misconduct deprived him of his due-process rights.

{¶ 228} We must determine whether the challenged statements were improper and, if so, whether they prejudiced McAlpin's right to a fair trial. *Donnelly*, 416 U.S. at 643, 94 S.Ct. 1868, 40 L.Ed.2d 431. Except when noted,

72

McAlpin failed to object to the comments and therefore cannot prevail absent plain error. Crim.R. 52(B); *Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, at ¶ 21.

### 1. Comments on the nature and circumstances of the offenses

{¶ 229} Although McAlpin acknowledges that the prosecutor's mitigation-phase closing argument properly "instructed the jurors to only consider the statutory aggravating factors," he argues that the closing argument improperly referred to the nature and circumstances of the offenses.

{¶ 230} During a mitigation-phase closing argument, "a prosecutor 'may introduce and comment upon * * * any evidence raised at trial that is relevant to the aggravating circumstances specified in the indictment of which the defendant was found guilty.' " (Ellipsis sic.) *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, ¶ 280, quoting *State v. Gumm*, 73 Ohio St.3d 413, 653 N.E.2d 253, syllabus. Indeed, R.C. 2929.03(D)(1) requires the sentencer to consider "any evidence raised at trial that is relevant to the aggravating circumstances the offender was found guilty of committing." However, it is improper for a prosecutor to describe nature-and-circumstances evidence as a statutorily defined aggravating circumstance. *Gumm* at 422.

{¶ 231} First, McAlpin contends that the prosecutor presented a "needlessly sentimental narrative" about Mr. Cars when addressing the "occupied structure" element of aggravated burglary. The prosecutor began his aggravated-burglary discussion with the element of "trespass in an occupied structure," stating that "the place that was trespassed here was Mr. Cars. That's the occupied structure. Who occupied it? Michael and Trina Kuznik." The prosecutor then brought up Zaczkowski's testimony about the ownership history of Mr. Cars. The prosecutor continued to restate portions of Zaczkowski's testimony, including that Mr. Cars was "the definition of a mom and pop shop," the "family lifeline," and "what [the]

family lived around, was based around." He continued with the same theme, concluding:

> That's where he trespassed into. So, when we talk about a trespass, this murder, these murders, they didn't happen out on the street.
>
> They didn't happen in a place where Michael and Trina felt unsafe. They happened inside Mr. Cars, what they considered to be their home.
>
> That's what you're weighing there. That he trespassed into that structure where they felt safe as they were closing up for the day.

**{¶ 232}** By contending that the jury would be "weighing" the fact "that [McAlpin] trespassed into that structure where [the victims] felt safe as they were closing up for the day," the prosecutor implied that the jury would weigh the nature and circumstances of the aggravated-burglary specification as aggravation. The prosecution's argument was not improper. *See State v. Mammone*, 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 143, 146; *State v. Froman*, 162 Ohio St.3d 435, 2020-Ohio-4523, 165 N.E.3d 1198, ¶ 124-125.

**{¶ 233}** Next, McAlpin objects to the prosecutor's comment with respect to the reckless-infliction-of-harm element of aggravated burglary. The prosecutor explained that the harm was the shooting of Michael and Trina and said Trina was shot in the back of the head "as she tried to run." The prosecutor continued: "That goes on the aggravating circumstances part of that scale, and that's a very heavy thing that you will weigh *as an aggravating circumstance*." (Emphasis added.)

**{¶ 234}** There was no evidence that Trina was shot "as she tried to run," so the prosecutor's statement was not based on the evidence and was improper. The

comment immediately following was also improper, as it expressly asked the jury to weigh the fact that Trina was trying to run from being shot "as an aggravating circumstance." Though improper, that single statement was not repeated and did not prejudice McAlpin by rendering his mitigation hearing fundamentally unfair.

{¶ 235} Later during his argument, the prosecutor stated: "Trina tried to run away. She tried to get out of that tire compression room door, and he shot her in the back of the head just as she got to that door." He continued by arguing that "Trina heard the first gunshot that killed Michael, and she tried to run and he shot her before she could even get to that door. That's how you know that they were committed within mere seconds of one another."

{¶ 236} McAlpin argues that the prosecutor was improperly commenting on what Trina was feeling or thinking in her final moments. Although neither comment explicitly mentions what Trina was thinking or feeling in her final moments, the prosecutor's comments were nevertheless improper because they strongly suggested that Trina's final moments were consumed with panic and fear in response to knowing that Michael had been shot. *See Kirkland*, 160 Ohio St.3d 389, 2020-Ohio-4079, 157 N.E.3d 716, at ¶ 116 (comments on the victim's thoughts prior to death are improper because they invite the jury to speculate on facts that have not been properly introduced through evidence). As discussed above, there was no evidence to support the prosecutor's statement that Trina tried to run. Nor was there evidence supporting the fact that she heard the gunshot that killed Michael. Thus, to the extent that the prosecutor's comment described "facts" not supported by the evidence or invited the jury to speculate on such facts, it was improper. We do not find, however, that McAlpin was prejudiced by these comments such that they influenced the jury's finding on the death-penalty specification.

{¶ 237} McAlpin also claims that the prosecutor's description of the murders as "execution-style" and "in cold blood" was "deliberately inflammatory

rhetoric." These comments were not improper. McAlpin shot Michael twice in the head. Both shots were fired at close range: one from three feet away at most, the other possibly from a few inches away. McAlpin shot Trina from a short distance in the back of the head.

{¶ 238} In light of this evidence, it was not improper to describe the killings as "in cold blood" and "execution-style." We have described a murder as "execution-style" when a defendant had shot his victim in the head four times, firing at least three shots at close range. *See State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 139. In another capital case, we called the murder of one person during an aggravated robbery a "cold-blooded killing that has no mitigating features." *State v. Fears*, 86 Ohio St.3d 329, 348, 715 N.E.2d 136 (1999); *see also State v. Jackson*, 92 Ohio St.3d 436, 452, 751 N.E.2d 946 (2001) (close-range gunshots to victims' heads were "cold-blooded, execution-style killings"). The evidence in this case supports the prosecutor's characterizations.

{¶ 239} McAlpin also points to the prosecutor's allegedly inflammatory description of the evidence that supported the "theft offense" element of the aggravated-robbery aggravating circumstance and the course-of-conduct specification. The prosecutor argued that McAlpin killed two innocent people for "an 11-year older [sic] Mercedes and a nine-year old BMW and whatever cash Michael had in his back pocket." He described the taking of "two innocent lives" for those vehicles as "pathetic." Neither comment was improper. The evidence sufficiently demonstrates that McAlpin's only motive to murder Michael and Trina was to steal cash and cars from the Mr. Cars lot.

### 2. Comments on McAlpin's unsworn statement

{¶ 240} McAlpin complains about the prosecutor's closing-argument comments about McAlpin's unsworn statement. The prosecutor said:

It was not subject to cross-examination like every other witness in this case.

And let's talk about what he actually said in the unsworn statement. This was his opportunity to tell you anything that he wanted about his history, his character, his background that might have been a reason not to impose the death penalty.

And what did he actually tell you? He told you that he stands on his innocence.

* * *

He told you that he stands on his innocence, and he told you that maybe this is all a good thing because it helped bring his family together.

Ladies and gentlemen, his statements to you in opening, and in his unsworn statement that he stands on his innocence are not mitigation. They're not mitigating. They are an attempt to raise what is called residual doubt.

McAlpin contends that it was error for the prosecutor to "undermin[e]" his unsworn statement by "emphasizing" that it was not subject to cross-examination. However, McAlpin is incorrect; the prosecutor's one comment to this effect reflected the truth regarding McAlpin's unsworn statement. When a defendant opts to make an unsworn statement, a prosecutor "may comment that the defendant's statement has not been made under oath or affirmation." *DePew*, 38 Ohio St.3d 275, 528 N.E.2d 542, at paragraph two of the syllabus.

{¶ 241} McAlpin also contends that the prosecutor's comment urging the jury to give McAlpin's unsworn statement no weight was improper. It was not. The prosecutor is entitled to argue that the aggravating circumstances outweigh the mitigation presented and that individual pieces of mitigation are not worthy of

weight as mitigation. *Wilson*, 74 Ohio St.3d 381, 399, 659 N.E.2d 292 (1996) ("Prosecutors can urge the merits of their cause and legitimately argue that defense mitigation evidence is worthy of little or no weight").

### 3. Comments disparaging the defense

{¶ 242} McAlpin claims that the prosecutor denigrated the defense when he argued on rebuttal that McAlpin "had the audacity to compare what happened to Trina and Michael to what he's going through in this courtroom." During his opening argument, McAlpin said: "[I]t's okay to take another's life to give comfort and sleep or closure to one family, but yet, at the same time, take away from the comfort and sleep of another family." And in his unsworn statement, McAlpin said, "I'm sorry for the loss that happened with the Kuzniks because I know what it feel[s] like to lose someone." Thus, the prosecutor's rebuttal was not denigrating the defense but merely responding to McAlpin's statements.

{¶ 243} McAlpin also objects to the prosecutor's statement on rebuttal that McAlpin gave "half ass respect to the family [when McAlpin said,] 'I know what you're going through.' " The prosecutor's statement was rash and unwise, but its prejudicial effect was minimal because the trial court sustained McAlpin's objection to the statement. Thus, any error created by the prosecutor's comment was corrected by the trial court's sustaining the objection and its later instructions that closing arguments are not evidence. *State v. Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, 108 N.E.3d 1, ¶ 237. Further, McAlpin has not rebutted the presumption that the jury followed the trial court's instruction. *See DePew*, 38 Ohio St.3d at 284, 528 N.E.2d 542.

### 4. Cumulative prosecutorial misconduct

{¶ 244} McAlpin contends that cumulative prosecutorial misconduct deprived him of a fair trial. While the prosecutors made some improper comments during the mitigation-phase closing arguments, we hold that the single or cumulative nature of the prosecutors' comments did not deprive McAlpin of a fair

trial. *See Fears*, 86 Ohio St.3d at 335-336, 715 N.E.2d 136. Further, McAlpin has not demonstrated that the outcome of the mitigation phase would have been different had the improper statements not been made. *See Keenan*, 66 Ohio St.3d at 410, 613 N.E.2d 203.

{¶ 245} Accordingly, we reject McAlpin's thirteenth proposition of law.

### M. Jury instructions

{¶ 246} In support of proposition of law Nos. XIV and XV, McAlpin argues that errors in the mitigation-phase jury instructions violated his rights and require a new mitigation hearing.

{¶ 247} Before McAlpin invoked his right to self-representation, his counsel filed a motion to instruct the jury that mercy is a mitigating factor. The trial court denied that motion. Beyond that, McAlpin never requested additional jury instructions, and he failed to object to the instructions provided. Thus, McAlpin has forfeited all but plain error. Crim.R. 52(B); *Barnes*, 94 Ohio St.3d at 27, 759 N.E.2d 1240.

### *1. Residual doubt*

{¶ 248} McAlpin complains about the trial court's failure to instruct on residual doubt. In proposition of law No. XIV, he acknowledges that in Ohio, a capital defendant is not entitled to argue residual doubt as a mitigating factor. *See State v. McGuire*, 80 Ohio St.3d 390, 686 N.E.2d 1112 (1997), syllabus ("Residual doubt is not an acceptable mitigating factor under R.C. 2929.04(B), since it is irrelevant to the issue of whether the defendant should be sentenced to death"). However, McAlpin contends that this court should reconsider its position on this issue.

{¶ 249} McAlpin contends that *Oregon v. Guzek*, 546 U.S. 517, 126 S.Ct. 1226, 163 L.Ed.2d 1112 (2006), "implicitly overruled" *McGuire*. In *Guzek*, the United States Supreme Court considered whether a capital defendant has a federal constitutional right to introduce, during a mitigation hearing, evidence not

presented during the trial phase "that shows he was not present at the scene of the crime." *Guzek* at 523. The court held that the Eighth and Fourteenth Amendments do not grant a capital defendant the right to present new evidence inconsistent with the defendant's conviction. *Id.* However, the *Guzek* court expressly clarified that its "previous cases had *not* interpreted the Eighth Amendment as providing a capital defendant the right to introduce at sentencing evidence designed to cast 'residual doubt' on his guilt of the basic crime of conviction." (Emphasis sic.) *Id.* at 525.

{¶ 250} McAlpin offers no persuasive reason to depart from precedent here. *See State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 160 (summarily rejecting the argument that residual doubt should be a mitigating factor). Thus, we reject these claims.

### 2. Other errors in mitigation-phase jury instructions

{¶ 251} Under his fifteenth proposition of law, McAlpin contends that the trial court erred when it instructed the jury that it could not consider sympathy and by failing to instruct the jury that it could consider mercy as a mitigating factor.

#### a. No sympathy or mercy

{¶ 252} McAlpin acknowledges our sympathy jurisprudence, which holds that "the instruction to exclude sympathy 'is intended to [e]nsure that the sentencing decision is based upon * * * guidelines fixed by statute.' " (Ellipsis sic.) *State v. O'Neal*, 87 Ohio St.3d 402, 416, 721 N.E.2d 73 (2000), quoting *Jenkins*, 15 Ohio St.3d 164, 473 N.E.2d 264, at syllabus. But he contends that our jurisprudence on this issue conflicts with *Kansas v. Marsh*, 548 U.S. 163, 126 S.Ct. 2516, 165 L.Ed.2d 429 (2006) which upheld the constitutionality of a jury instruction that explicitly allowed for fairness and mercy considerations in mitigation. McAlpin asserts that mercy is nothing more than feelings of sympathy tethered to, or engendered by, the evidence introduced in the mitigation phase. He therefore argues that an instruction on the same should be required under the dictates of *Marsh*. We have rejected this argument on several occasions in recent years. *State*

*v. Hundley*, 162 Ohio St.3d 509, 2020-Ohio-3775, 166 N.E.3d 1066, ¶ 122 (noting that *Marsh* did not hold that instruction on considering mercy in mitigation is required); *Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, 140 N.E.3d 616, at ¶ 362; *State v. Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, 114 N.E.3d 1092, ¶ 179, 224. Moreover, mercy is not a mitigating factor. *Id.*

### b. Equipoise

{¶ 253} McAlpin argues that the trial court should have explained "to the jury how to proceed if an[y] one of the jurors determined that the aggravating factors were in equipoise with the mitigation."

{¶ 254} However, the court did instruct the jurors how to proceed in that circumstance. The court instructed, "If the weight of the aggravating circumstances and mitigating factors *are equal*, then you *must proceed* to consider the life sentence alternatives." (Emphasis added.) The court then instructed the jurors that they "should proceed to consider and choose one of the life sentence alternatives if any one or more of [them] conclude the State has failed to prove beyond a reasonable doubt the aggravating circumstances outweigh the mitigating factors." These instructions are correct statements of law, and we have previously held that similar jury instructions, even if awkwardly phrased, are not plainly erroneous. *See State v. Williams*, 99 Ohio St.3d 439, 2003-Ohio-4164, 793 N.E.2d 446, ¶ 95.

{¶ 255} Because McAlpin has not shown that the trial court's mitigation-phase instructions were erroneous in any respect, we reject his fourteenth and fifteenth propositions of law.

### N. Cumulative error

{¶ 256} As his sixteenth proposition of law, McAlpin contends that his death sentence is unreliable due to the cumulative effect of the numerous errors that pervaded the guilt and mitigation phases of his trial, many of which would likely not have been forfeited but for his decision to waive counsel and proceed pro se. His arguments focus on the fact that as a pro se defendant with no legal experience,

he was not in a position to know when to object or how to adequately ensure that his constitutional rights remained protected. He additionally contends that the plain-error standard of review is "nearly impossible to meet," and he "concedes that he cannot prove [in] this appeal that the result would have been otherwise, or that he would have been acquitted." At bottom, McAlpin presents a cumulative-error argument, but recognizing that our caselaw forecloses a claim of cumulative error when the errors were not objected to and no plain error is found, he asks this court to adopt a more favorable standard for a pro se defendant in a capital case. We decline to do so.

{¶ 257} Under the doctrine of cumulative error, "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal." *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 223.

{¶ 258} As explained above, numerous errors occurred at McAlpin's trial, but none rose to the level of reversible error. The vast majority of the errors found were not objected to, and we have thus applied the plain-error standard to our review of those claims. Finding that the errors did not prejudice McAlpin's substantial rights and that none were outcome determinative, we have rejected each claim in turn.

{¶ 259} Unlike preserved errors that might be harmless alone but prejudicial in the aggregate, unobjected-to errors that do not meet the plain-error standard "cannot become prejudicial by sheer weight of numbers," *State v. Hill*, 75 Ohio St.3d 195, 212, 661 N.E.2d 1068 (1996); *see also State v. Davis*, 62 Ohio St.3d 326, 348, 581 N.E.2d 1362 (1991). McAlpin seems to concede this point. He urges us, however, to apply a more lenient standard of review, arguing that "death is different," *Woodson v. North Carolina*, 428 U.S. 280, 322, 96 S.Ct. 2978, 49 L.E.2d 944 (1976) (Rehnquist, J., dissenting), and that pro se defendants should be

allowed "more leniency than what plain error review offers." Specifically, he asks this court to apply a new standard—the contours of which he does not define—that would result in reversal "[w]here appellate review reveals the result of trial and/or the sentence is unreliable." However, plain-error review already is reserved for "exceptional circumstances" and "only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. Adopting a lesser standard for unpreserved errors that is based on our perceptions of whether the guilty verdict or the death sentence is reliable and that applies only to pro se defendants in a capital trial would be unfair to defendants who do not waive their right to counsel. Adopting such a standard would also result in the perverse effect of encouraging defendants to proceed pro se in capital cases since their lack of legal knowledge or ability would enhance their chances of success on appeal if found guilty and sentenced to death. For obvious reasons, this is not a standard this court will adopt. Thus, we reject McAlpin's invitation to create a different standard of review.

{¶ 260} Accordingly, we reject the sixteenth proposition of law.

## O. Constitutional and international-law challenges

{¶ 261} In support of his seventeenth proposition of law, McAlpin raises several constitutional challenges to the death penalty and the statutes governing its imposition in Ohio. We have consistently rejected each of these arguments. *See*, *e.g.*, *Kirkland*, 140 Ohio St.3d 73, 2014-Ohio-1966, 15 N.E.3d 818, at ¶ 106, 109, 110, 113, 116, and 117 (rejecting claims that Ohio's death-penalty scheme is unconstitutional because it gives prosecutors unfettered discretion to indict, it is neither the least restrictive punishment nor an effective deterrent, it allows juries to weigh aggravating and mitigating factors (which leads to arbitrary and capricious imposition of death sentences), the scheme imposes an impermissible risk of death on capital defendants who choose to go to trial rather than plead guilty, its statutes are unconstitutionally vague, and the law governing Ohio's proportionality review

is unconstitutional); *Jenkins*, 15 Ohio St.3d at 167-173, 473 N.E.2d 264 (rejecting the claims that the death penalty is unconstitutional because it is not the least restrictive punishment, amounts to cruel and unusual punishment, gives prosecutors too much discretion, and results in the improper imposition of death sentences through the presentation and weighing of aggravating versus mitigating factors); *State v. Mason*, 153 Ohio St.3d 476, 2018-Ohio-1462, 108 N.E.3d 56, ¶ 43 (rejecting the contention that Ohio's death-penalty scheme violates a defendant's Sixth Amendment right to a trial by jury).

{¶ 262} Accordingly, we reject proposition of law No. XVII.

## IV. INDEPENDENT SENTENCE EVALUATION

{¶ 263} We have a duty to independently review the death sentence for appropriateness and proportionality. R.C. 2929.05(A). In conducting this review, we must determine whether the evidence supports the jury's finding of aggravating circumstances, whether the aggravating circumstances outweigh the mitigating factors, and whether McAlpin's death sentence is proportionate to those affirmed in similar cases. *Id.*

{¶ 264} Before sentencing, the two aggravated-murder counts as to Trina were merged and the two aggravated-murder counts as to Michael were merged. The state proceeded with Count 1 (felony murder of Trina, R.C. 2903.01(B)) and Count 2 (felony murder of Michael, R.C. 2903.01(B)).

### A. Aggravating circumstances

{¶ 265} McAlpin was convicted of four capital specifications each as to Counts 1 and 2. The jury found beyond a reasonable doubt that McAlpin purposely killed Trina and Michael as part of a course of conduct, R.C. 2929.04(A)(5). The jury also found that with respect to each victim, (1) McAlpin committed the aggravated murder while committing aggravated burglary and either was the principal offender or committed the offense with prior calculation and design, R.C. 2929.04(A)(7), and (2) McAlpin committed the aggravated murder while

committing aggravated robbery and either was the principal offender or committed the offense with prior calculation and design, R.C. 2929.04(A)(7). The jury also found McAlpin guilty of aggravated murder in the course of a kidnapping, R.C. 2929.04(A)(7), but the trial court merged the kidnapping specification into the aggravated-robbery specification before sentencing.

{¶ 266} The evidence in the record overwhelmingly supports the jury's finding as to the course-of-conduct specification. The murders were similar and occurred within a short period of time in the same building. *See State v. Sapp*, 105 Ohio St.3d 104, 2004-Ohio-7008, 822 N.E.2d 1239, ¶ 52 (course-of-conduct aggravating circumstance requires a "factual link" between the murders).

{¶ 267} The evidence also supports the jury's finding as to the aggravated-burglary and aggravated-robbery specifications. McAlpin completed the aggravated burglary when he entered Mr. Cars with the intent to kill the occupants and to steal cars. He completed the aggravated robbery when he killed Michael and Trina before stealing cash, car keys, a DVR player, and two cars.

{¶ 268} Further, the evidence shows that McAlpin was the principal offender. His DNA was found in the back office where Trina was shot and inside the back pocket of Michael's jeans. Surveillance video showed that only McAlpin, not Diggs or Keener, entered the Mr. Cars building. Together, the surveillance video, forensic cellular-phone and location-data analysis, and DNA results proved that McAlpin was the only person inside the Mr. Cars building with a loaded firearm when Michael and Trina were murdered.

### B. Mitigating factors

{¶ 269} We must also weigh the above aggravating circumstances against any mitigating evidence about "the nature and circumstances of the offense" and McAlpin's "history, character, and background." R.C. 2929.04(B). In addition, we must consider and weigh any evidence of the mitigating factors specifically listed in R.C. 2929.04(B)(1) through (7).

### 1. McAlpin's mitigation evidence

{¶ 270} McAlpin presented mitigation testimony from six family members. He made an unsworn statement and also made a statement in allocution before sentencing. In addition, a presentence investigation ("PSI") report and a "mitigation of penalty report" were prepared at McAlpin's request. The court considered both reports as mitigating evidence. However, at McAlpin's request, the jury did not consider either report.

{¶ 271} Pursuant to R.C. 2929.03(D)(1), "[t]he court, and the trial jury if the offender was tried by a jury, shall consider any report prepared pursuant to this division and furnished to it." Thus, when a capital defendant requests a PSI and mental examination, R.C. 2929.03(D)(1) expressly "requires that these reports be given to the court, the jury, and the parties, and that they * * * be considered during sentencing." *State v. Esparza*, 39 Ohio St.3d 8, 10, 529 N.E.2d 192 (1988).

{¶ 272} The trial court erred when it gave McAlpin the option of not allowing the jury to view the PSI and Dr. Rodio's report. However, even when a trial court erroneously excludes mitigating evidence from the jury, our independent reweighing can cure the error. *Williams*, 74 Ohio St.3d 569, 578, 660 N.E.2d 724 (1996).

### a. McAlpin's unsworn statement

{¶ 273} McAlpin stated that he had had a rough life growing up. He continued: "And as I've been thinking about as this time been going on, and this case has been going on, especially right in these few moments, it's been hard on our families, been separated a lot." He opined that his mitigation hearing "has been the most at one [his] family has been." He stated that he believed that everything happens for a reason and that "[m]aybe [he] had to be the sacrifice" to get his family back together. McAlpin told the jury: "As I say, I still stand on my innocence. But yet, at the same time, I still do give out my respect and I would like to say I'm sorry

for the loss that happened with the Kuzniks because I know what it feel[s] like to lose someone."

### b. Family history, childhood, and educational background

**{¶ 274}** Lay witnesses and Dr. Rodio's report provided evidence of McAlpin's family history and described his very difficult childhood, including abandonment by his biological father, physical and verbal abuse by his mother's boyfriend, and trauma related to finding his mother dead from an overdose.

**{¶ 275}** John McAlpin Sr., McAlpin's uncle, stated he knew McAlpin had "a rough life" and elaborated that "[t]here was a lot of gruesome things going on." He testified that McAlpin found his mother dead when he was young and that it was hard on McAlpin. McAlpin Sr. concluded that McAlpin did not have a "normal childhood."

**{¶ 276}** John Mills, McAlpin's biological father, testified that he "got along beautifully" with McAlpin. Mills explained that he had left for North Carolina at some point in McAlpin's life and that he did not "know what's happened." Mills told McAlpin he loved him.

**{¶ 277}** Kimilah McAlpin, McAlpin's older sister, testified that she essentially raised McAlpin and his younger brother "probably the first five years of their life." She testified that as a child, McAlpin was athletic, hyper, and funny. He had shot himself in the leg as a child. Kimilah, who was nine years older than McAlpin, ran away from home when she was about 14 years old.

**{¶ 278}** John McAlpin, McAlpin's older brother, testified that as children, he and McAlpin "bumped heads" but still stuck together. He testified that he went with their father to North Carolina and thought that McAlpin may have grown up believing that his father did not love him. John explained that McAlpin had no guidance growing up and that things got worse after their mother died in 2006. On cross-examination, John spoke of a time when they were young when he "whupped [McAlpin]" for taking his "Black & Mild" and a pair of shoes. He expressed regret

over his actions and said, "Only thing [McAlpin] want[ed] to do is be in my shoes, and I never realized that."

{¶ 279} Tunisha Jackson, McAlpin's cousin, grew up around him. In her opinion, McAlpin had "been a good kid," and she testified that she was "shocked that he's here going through all of this." She also testified that McAlpin's mother's boyfriend was verbally and physically abusive to McAlpin and to his mother. Jackson testified that there "was a lot of kind of arguing of things going on when they were children" and that she was "pretty sure that affected them in a lot of different ways when it came to their mother and their household."

{¶ 280} Josephine Evans, McAlpin's aunt, told the jury that the whole family got together frequently when McAlpin was young but that the family became more separated as adults. She testified, "[We] still have a lot of love. That's why I'm here."

{¶ 281} At McAlpin's request, the trial court referred him to the Court Psychiatric Clinic pursuant to R.C. 2947.06(B) for an evaluation of mitigating factors. Dr. Rodio interviewed McAlpin on May 8, 2019, for 90 minutes. Dr. Rodio also considered many additional sources.

{¶ 282} Dr. Rodio's report indicates that McAlpin was born in 1987. He has an older half-sister, an older brother, a younger brother, and a younger half-brother. McAlpin's codefendant Jerome Diggs Jr. is his younger half-brother. Records revealed that McAlpin's father was frequently drunk and physically abused McAlpin. McAlpin told Dr. Rodio that his mother was "awesome," but records showed that she hit her children when she was drunk and/or using drugs. McAlpin's mother had a history of drug abuse and was accused of stealing drugs from an emergency department. She died from a heroin overdose in 2006, and McAlpin found her body.

{¶ 283} Dr. Rodio reported that when McAlpin was 19, he made efforts to care for 12-year-old Diggs, as a means of maintaining a sense of family continuity

and minimizing contact with Jerome Diggs Sr. Other records indicated that when McAlpin was six years old, he accidentally shot himself in the leg with a loaded gun he found under a couch. Dr. Rodio reported that the children-services agency summarized in its report documenting the incident: " 'There does appear to be a great deal of violence going on in the home.' "

{¶ 284} Education records showed that McAlpin was initially successful in school but that in middle school, "being around the wrong people" and smoking marijuana caused his grades to decline. Special education eventually became involved with McAlpin due to his failing grades. He was expelled from school once for having a weapon—a peer's pocketknife—and another time for having what appeared to be illegal drugs that were later determined to be fake. He left school in ninth grade due to being adjudicated delinquent and placed in the custody of the Department of Youth Services. In 2007, he was administered an IQ test that indicated an IQ of 80, which suggested intellectual limitations. But a follow-up IQ test in 2008 yielded a score of 94, in the average range of intelligence. He obtained his GED in 2012 while incarcerated.

{¶ 285} McAlpin told Dr. Rodio that he has three children with three different women: a 13-year-old son who lives in North Carolina with his mother, a 12-year-old daughter who lives in the Cleveland area, and an 11-year-old son who lives in North Carolina. He has intermittent contact with his daughter.

### 2. Employment history

{¶ 286} According to Dr. Rodio's report, McAlpin has no history of consistent employment. This is largely due to the significant amount of time he has spent in the criminal-justice system since his youth.

### 3. Medical and psychological history

{¶ 287} Dr. Rodio reported that when McAlpin was 12 years old, he was hit on the head with a brick. As a result of that injury, McAlpin began having a pattern of seizures precipitated by flashing lights or stress. McAlpin reported being

prescribed Dilantin, an antiseizure medication. He reported experiencing both petit mal and grand mal seizures, which result in partial physical slowing or loss of consciousness, respectively.

{¶ 288} When McAlpin was nine years old, he was repeatedly raped by a boyfriend of McAlpin's mother. These traumatic events resulted in "reactions of isolation, sadness, loss of interest in life and decreased appetite." Regarding McAlpin's traumatic past, Dr. Rodio reported that McAlpin said, "We all go through rough stuff" and that he works to focus on the present. He reported having been prescribed antianxiety medications and mood-stabilizing medications in the past, but he told Dr. Rodio that he "just do[esn't] believe in psych meds." Dr. Rodio reviewed a 2008 standard psychological screening test, which "indicate[d] that [he] appears to be experiencing some type of turmoil associated with past traumatic events thus presenting itself as depression and anxiety. In addition, [McAlpin] has a chronic problem with anger. This anger may manifest itself suddenly [and is] thus exhibited as impulsive behavior with lack of control." The doctor who conducted the 2008 test added that McAlpin "appears to have little regard for authority thus will most likely have trouble following rules and regulations."

{¶ 289} Dr. Rodio interviewed McAlpin on May 8, 2019. Dr. Rodio reported that "[o]n cognitive screening, [McAlpin] was alert and oriented to month, date, day and year." McAlpin performed well on tests for memory and concentration, and his "thoughts were sequential and reality-based." McAlpin told Dr. Rodio that he felt relaxed and Dr. Rodio observed matching behaviors, but Dr. Rodio noted that McAlpin became concerned and vigilant when he needed to clarify legal matters. According to Dr. Rodio, McAlpin described "periods of depression, marked by irritability, crying, shifts in his sleep cycle and a 'drained' level of energy." In 2006, McAlpin "impulsively cut his right wrist with a butcher's knife and due to the unexpected seeping, went to the ER for stitches." Dr. Rodio

also reported that while McAlpin was in jail in 2006, he was interrupted while attempting to hang himself with a sheet.

**{¶ 290}** Dr. Rodio diagnosed McAlpin with depressive disorder; he also considered a diagnosis of posttraumatic stress disorder ("PTSD"). Dr. Rodio based his findings on McAlpin's traumatic childhood, including finding his mother dead from an overdose. Dr. Rodio also diagnosed McAlpin with moderate marijuana-use disorder but noted that it was in remission.

### C. Sentence evaluation

**{¶ 291}** The following mitigating factors enumerated in R.C. 2929.04(B) are not mitigating in this case: the nature and circumstances of the offense, R.C. 2929.04(B); inducement by the victim, R.C. 2929.04(B)(1); offender under duress, coercion, or strong provocation, R.C. 2929.04(B)(2); offender lacking substantial capacity due to mental disease or defect, R.C. 2929.04(B)(3); youth of the offender, R.C. 2929.04(B)(4); offender lacking significant criminal history, R.C. 2929.04(B)(5); and offender not the principal offender, R.C. 2929.04(B)(6).

**{¶ 292}** The murders of Michael and Trina devastated their family, leaving three children—two of whom were minors—without parents. McAlpin murdered Michael and Trina for the sole purpose of stealing money and two used cars. And the evidence overwhelmingly demonstrates that McAlpin was the mastermind behind these crimes.

**{¶ 293}** Yet there is strong mitigating evidence regarding McAlpin's history and background, *see* R.C. 2929.04(B), and under the catchall provision, R.C. 2929.04(B)(7).

**{¶ 294}** Dr. Rodio's report indicates that McAlpin suffers from depressive disorder and may have PTSD. McAlpin's biological father abandoned his wife and children when McAlpin was young. That abandonment was exacerbated by the fact that McAlpin's older brother went with their father to North Carolina to live with him. John, the older brother, expressed as much, testifying that he felt guilty

about the fact that McAlpin may have grown up believing that their father did not love him. McAlpin's childhood was also marred by severe abuse and emotional trauma. McAlpin's cousin testified that McAlpin's mother's boyfriend had verbally and physically abused McAlpin and his mother. And Dr. Rodio indicated in his report that McAlpin had been repeatedly raped as a child by his mother's "male friend." Finally, McAlpin discovered his mother's body when she died from a drug overdose.

{¶ 295} McAlpin did not present any evidence that he suffered from a mental disease or defect that would have prevented him from appreciating the criminality of his conduct or from conforming his conduct to the law at the time of the murders. In fact, his taking the shop's DVR system, which housed all of the shop's security-camera footage, confirms that he understood that his conduct was criminal. Thus, McAlpin's mental-health issues do not qualify as a mitigating factor under R.C. 2929.04(B)(3).

{¶ 296} However, we consider this evidence under R.C. 2929.04(B)(7), the catchall mitigating factor. *See Treesh*, 90 Ohio St.3d at 492, 739 N.E.2d 749 (considering evidence of mental-health issues under R.C. 2929.04(B)(7) when evidence did not satisfy the criteria of R.C. 2929.04(B)(3)). In addition to the evidence of mental-health problems, Dr. Rodio uncovered McAlpin's history of seizures, which began after he was hit on the head with a brick at the age of 12. We give evidence of his mental-health and other medical conditions significant weight. However, we decline to give weight to McAlpin's history of moderate marijuana-use disorder; Dr. Rodio specifically noted that it was in remission.

{¶ 297} The evidence demonstrated that McAlpin lacked any parental support beginning at the age of five. His father abandoned him and took his older brother away. Family members testified that McAlpin's mother did the best she could, but she was addicted to heroin and brought an abuser into McAlpin's life. The fact that McAlpin was repeatedly raped as a child is further evidence of his

awful and troubled upbringing. His uncle testified that "a lot of gruesome things" went on while McAlpin was growing up.

{¶ 298} McAlpin grew up with significant adversity and little to no moral guidance. This utter lack of parental authority and positive parental role models is perhaps best demonstrated by the fact that at age six, McAlpin shot himself in the leg with a loaded gun he found under a couch. McAlpin's history and background should be accorded some weight. *See Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, 172 N.E.3d 841, at ¶ 208 (growing up in a dysfunctional family in an unstable home environment, in which the defendant observed combative and violent behavior and received corporal punishment, entitled to some weight); *State v. Murphy*, 91 Ohio St.3d 516, 547, 747 N.E.2d 765 (2001) (affording some weight to the defendant's neglected childhood "with little or no moral guidance").

{¶ 299} McAlpin's mitigation evidence has weight. However, it pales in comparison to the course-of-conduct, aggravated-robbery, and aggravated-burglary aggravating circumstances. Thus, we find that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt.

### D. Proportionality

{¶ 300} When comparing capital cases involving a course of conduct under R.C. 2929.04(A)(5), we conclude that as to the murder of each victim, McAlpin's being sentenced to death is both appropriate and proportionate. *See Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, at ¶ 329; *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 120. The death penalty is also appropriate and proportionate when compared with capital cases involving aggravated murders committed during an aggravated burglary, *see*, *e.g.*, *State v. Davie*, 80 Ohio St.3d 311, 334, 686 N.E.2d 245 (1997), and aggravated murder committed during an aggravated robbery, *see*, *e.g.*, *State v. Roberts*, 150 Ohio St.3d 47, 2017-Ohio-2998, 78 N.E.3d 851, ¶ 116.

**{¶ 301}** For the foregoing reasons, we affirm the convictions and death sentence.

Judgment affirmed.

O'CONNOR, C.J., and KENNEDY, DEWINE, DONNELLY, and BRUNNER, JJ., concur.

FISCHER, J., concurs, with an opinion.

_____

**FISCHER, J., concurring.**

**{¶ 302}** I concur in the court's judgment affirming appellant Joseph McAlpin's convictions and sentence of death, and I join the majority opinion.

**{¶ 303}** I write separately to stress the need to reevaluate Ohio's jurisprudence related to standby and hybrid representation. This case illustrates the complications that arise in standby-counsel situations. It was nearly impossible in this case for standby counsel to act merely as procedural advisors in the courtroom. We should not be placing defendants and their lawyers in these difficult positions without more guidance and flexibility. Hybrid representation is clearly supported by the text of the Ohio Constitution, and this case underscores the need for this court to recognize the constitutional right to hybrid representation.

## I. Standby Counsel's Impossible Situation

**{¶ 304}** McAlpin asserts in his second proposition of law that his standby counsel interfered with his trial preparation and strategy. The majority opinion correctly rejects this proposition of law because McAlpin was unable to demonstrate plain error. But in evaluating this proposition of law, it is important that we recognize the difficulties that McAlpin's standby counsel faced in this case.

**{¶ 305}** McAlpin was charged with over 30 criminal counts, including four counts of aggravated murder with death-penalty specifications. There is no doubt that the serious nature of the offenses and the criminal penalties involved made this case more challenging than the average criminal case.

{¶ 306} And from the beginning, McAlpin wanted to control and understand his case. He wanted to see discovery and evaluate the evidence being brought against him. His involvement was important to him; it was, as McAlpin put it, a matter of life and death.

{¶ 307} And while his counsel were preparing a defense, McAlpin became frustrated with the number of continuances, his inability to participate fully in the process due to "counsel only" discovery designations, and strategy conflicts with defense counsel. McAlpin wanted the ability to fully dictate the trial strategies, and it seemed to him that his requests were not being heard. He eventually decided to proceed pro se instead of retaining new counsel despite the trial court's warnings of the difficulties he might face.

{¶ 308} While honoring McAlpin's decision to proceed pro se, the trial court appropriately appointed standby counsel for him. The court informed McAlpin that standby counsel were there only to aid with the procedural hurdles and were permitted to act on his behalf only if he was no longer representing himself. The court emphasized, "We don't have hybrid counsel in Ohio."

{¶ 309} Despite the trial court's reminders of the duties and limitations of standby counsel, there were several instances when standby counsel did more than simply provide McAlpin advice regarding procedural hurdles. But standby counsel did not have much choice to act otherwise. McAlpin's standby counsel were placed in a position that required involvement beyond what would typically be necessary for standby counsel. *See, e.g.*, *State v. Hackett*, 164 Ohio St.3d 74, 2020-Ohio-6699, 172 N.E.3d 75, ¶ 61 (Stewart, J., concurring) (standby counsel should assist in overcoming procedural or evidentiary obstacles and help ensure the defendant's compliance with basic courtroom procedure and protocol).

{¶ 310} In order to ensure that they and McAlpin had everything necessary to safeguard the best possible outcome at trial without violating McAlpin's right to self-representation, *see id.* at ¶ 16, standby counsel had to walk a paper-thin line.

They aided McAlpin in obtaining information regarding DNA evidence from the relevant laboratory, given that McAlpin was struggling to communicate from prison. In corresponding with experts on McAlpin's behalf, standby counsel had to balance McAlpin's best interest with McAlpin's demand for an expert report that would not only support the state's version of events but could be used against McAlpin at trial. Standby counsel were stuck between a rock and a hard place— follow orders and make it harder for McAlpin to try the case or save the defendant from himself and possibly infringe on his right to self-representation. This was an impossible, no-win situation.

{¶ 311} This situation, however, would have been easier to navigate if this court had previously recognized Ohio's constitutionally guaranteed right to hybrid representation, thus allowing for clear guidelines to develop to determine the extent of defense counsel's participation in a case.

## II.  Hybrid Representation in Ohio

{¶ 312} Hybrid representation is the right to represent oneself with the assistance of counsel, with the defendant and defense counsel sharing responsibilities in preparing for and conducting trial. *Hackett*, 164 Ohio St.3d 74, 2020-Ohio-6699, 172 N.E.3d 75, at ¶ 34 (Fischer, J., concurring), citing *State v. Martin*, 103 Ohio St.3d 385, 2004-Ohio-5471, 816 N.E.2d 227, ¶ 29. It is true that this court has held that there is no right under the Ohio Constitution to hybrid representation. *See State v. Thompson*, 33 Ohio St.3d 1, 6, 514 N.E.2d 407 (1987); *Martin* at paragraph one of the syllabus. However, this court never examined the plain language of the Ohio Constitution in reaching that conclusion in *Martin* and *Thompson*. *Hackett* at ¶ 35-36 (Fischer, J., concurring).

{¶ 313} Instead, to reach its conclusions in *Martin* and *Thompson*, this court relied on two cases that did not examine language contained in or similar to Article I, Section 10 of the Ohio Constitution—*Parren v. State*, 309 Md. 260, 523 A.2d 597 (1987), and *McKaskle v. Wiggins*, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122

(1984). In *Parren*, the Court of Appeals of Maryland rejected hybrid representation based on the Sixth Amendment and its own constitution, which only provides that "every man hath a right * * * to be allowed counsel." *Parren* at 262, fn. 1; Maryland Constitution, Declaration of Rights, Article 21. And in *McKaskle*, the United States Supreme Court analyzed the issue under only the Sixth Amendment, which permits a defendant "to have the Assistance of Counsel for his defense." Neither *Parren* nor *McKaskle* shed light on how the right should be interpreted under the Ohio Constitution.

{¶ 314} This court needs to reevaluate *Martin* and *Thompson* in light of the specific words contained in Article I, Section 10 of the Ohio Constitution, because the plain language of that provision strongly supports the argument that a criminal defendant has a constitutional right to hybrid representation. Article I, Section 10 of the Ohio Constitution states, "In any trial, in any court, the party accused shall be allowed to appear and defend in person *and* with counsel." (Emphasis added.) The word "and" is conjunctive; the disjunctive word "or" is not found in the quoted constitutional provision. As a matter of grammar and basic reading comprehension, Article I, Section 10 provides a probable constitutional right to hybrid representation.

**III. Hybrid Representation is a Better Solution to the Standby-Counsel Issue**

{¶ 315} Hybrid representation is often considered undesirable. *See* Rondinelli, *In Defense of Hybrid Representation: The Sword to Wield and the Shield to Protect*, 27 Wm. & Mary Bill of Rts.J. 1313, 1320-1321 (2019). Some argue that hybrid representation would create confusion about who makes the ultimate decisions at trial, ethical concerns for the attorneys, and various boundary problems at trial. *See Hackett*, 164 Ohio St.3d 74, 2020-Ohio-6699, 172 N.E.3d 75, at ¶ 10. But even if some difficult situations would arise if hybrid representation were permitted, that is not a valid reason to deny a right that is apparent in the Ohio

Constitution—especially when those same difficult situations often arise in cases involving standby counsel.

{¶ 316} "A constitution is, in fact, and must be regarded by the judges as, a fundamental law." Hamilton, The Federalist No. 78 at 467 (Clinton Rossiter Ed.1961). Constitutional rights must therefore prevail, even when they protect undesirable actions or outcomes. *See, e.g.*, *Texas v. Johnson*, 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (flag desecration is protected speech); *State v. Lessin*, 67 Ohio St.3d 487, 620 N.E.2d 72 (1993) (same). "If the mere fact that the procedures necessary to protect a person's constitutional rights are burdensome were sufficient to overcome the need to protect those rights, then freedoms like our right to free speech, peacefully assemble, and bear arms could be easily vanquished." *Hackett* at ¶ 39 (Fischer, J., concurring). We must follow the Constitution, and the Ohio Constitution plainly supports a right to hybrid representation.

{¶ 317} Additionally, the hypothetical difficulties identified by critics of hybrid representation already reach full realization in cases involving appointed standby counsel. *See* Poulin, *The Role of Standby Counsel in Criminal Cases: In the Twilight Zone of the Criminal Justice System*, 75 N.Y.U.L.Rev. 676, 687 (2000) (self-representation tends to drift toward hybrid representation, amplifying the ambiguity of standby counsel's role). This case is a prime example. Standby counsel was instructed by the court to serve in a strictly procedural role, but in fact, it would have been nearly impossible for them to maintain a completely passive role given the circumstances of this case.

{¶ 318} If this court had previously recognized a right to hybrid representation in Ohio, the difficulties in this case could have been managed much more efficiently. With hybrid representation, there is not a fictitious or abstract set of guidelines for representation, because there is less concern with usurping the defendant's right to self-representation. With hybrid representation, defense

counsel, the defendant, and the court can discuss the scope of the representation and come to an agreement that satisfies the defendant's needs.

{¶ 319} Here, defense counsel and McAlpin could have come to an agreement that limited the scope of counsel's representation to avoid the messy situation that occurred due to the generic standby-counsel designation in this complex capital case. *See* Prof.Cond.R. 1.2(c). Additionally, there could have been a designation of lead counsel so that the trial court, the attorneys, and McAlpin all understood who would be responsible for final decisions made in the course of the proceedings. *See Hackett*, 164 Ohio St.3d 74, 2020-Ohio-6699, 172 N.E.3d 75, at ¶ 41 (Fischer, J., concurring). This approach would have prevented confusion, alleviated ethical concerns, and still enabled McAlpin to engage in his defense as much or as little as he wanted. After all, it was his life that hung in the balance!

{¶ 320} If criminal defendants were allowed to exercise their constitutional right to hybrid representation under Article I, Section 10 of the Ohio Constitution, they could have a much more active role in their defense and attorneys would have a clearer understanding of their own role than is possible when they are appointed as standby counsel. While this process would be different from what has occurred in the past, that does not mean that such a change would be impossible or overly burdensome—this type of change would restore confidence in the justice system and encourage increased participation by Ohio's criminal defendants and more efficiency in Ohio's courts.

## IV. Conclusion

{¶ 321} This case is a clear illustration of the problems with standby-counsel guidelines in Ohio. When the issue of standby counsel or hybrid representation is next properly before this court, it should reevaluate its decisions in *Martin*, 103 Ohio St.3d 385, 2004-Ohio-5471, 816 N.E.2d 227, and *Thompson*, 33 Ohio St.3d 1, 6-7, 514 N.E.2d 407 (1987), in light of the plain text of Article I, Section 10 of the Ohio Constitution. Additionally, this court should acknowledge

that allowing defendants to exercise a right to hybrid representation would likely eliminate many of the problems that we witnessed in this case between the defendant and his standby counsel.

**{¶ 322}** I respectfully concur.

—————————————

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Callista N. Plemel and Mary M. Frey, Assistant Prosecuting Attorneys, for appellee.

David L. Doughten and John B. Gibbons, for appellant.

—————————————